METRO–GOLDWYN–MAYER
STUDIOS, INC., et al.,
Plaintiffs,

v.

GROKSTER, LTD. et al., Defendants.

Jerry Leiber, et al., Plaintiffs,

v.

Consumer Empowerment BV,
et al., Defendants.

And Related Counterclaims.

Nos. CV 01–8541 SVW (FMOx),
CV 01–9923 SVW (FMOx).

United States District Court,
C.D. California.

Oct. 16, 2007.

Ana C. Reyes, Beth A. Levene, David E. Kendall, Joseph Marshall Terry, Kevin

Hardy, Nicholas J. Boyle, Robert J. Shaughnessy, Thomas G. Hentoff, Williams & Connolly, Donald B. Verrilli, Jr, Steven B. Fabrizio, Victoria H. Jueds, Jenner and Block, Washington, DC, Dean Garfield, Gregory Paul Goeckner, Motion Picture Association of America Inc, Encino, CA, Jan B. Norman, Jan B. Norman Law Offices, Russell J. Frackman, George M. Borkowski, Mitchell Silberberg and Knupp, Los Angeles, CA, for Plaintiffs.

Charles S. Baker, Porter & Hedges, Houston, TX, Andrew P. Bridges, Jennifer A. Golinveaux, Winston and Strawn, San Francisco, CA, Terri Yuh-Lin Chen, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Jeffrey K. Compton, Markun Zusman and Compton, Pacific Palisades, CA, Joseph R. Taylor, Liner Yankelevitz Sunshine & Regenstreif, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION [01–8541: 1215]; ORDER DENYING WITHOUT PREJUDICE STREAMCAST'S MOTION FOR A STAY OF THE PERMANENT INJUNCTION'S ENFORCEMENT PENDING APPEAL [01–8541: 1259]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

On September 27, 2006, this Court granted Plaintiffs'[1] motion for summary judgment on the question of liability as against StreamCast Networks, Inc. ("StreamCast"). In that Order, the Court recounted this case's procedural history, and engaged in a detailed analysis of the factual record pertaining to StreamCast's inducement of copyright infringement. *See Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F.Supp.2d 966, 971, 975–92 (C.D.Cal.2006). StreamCast is the only defendant remaining in this case. As the parties are well aware, StreamCast operates and distributes the Morpheus System and Software.

Presently before this Court is Plaintiffs' motion for a permanent injunction against StreamCast. StreamCast has vigorously opposed the imposition of a permanent injunction. StreamCast also asks for an evidentiary hearing, additional discovery, or at least a stay of the permanent injunction's enforcement pending appeal.

An initial hearing was held before this Court on February 12, 2007. During the hearing, the Court espoused its concern regarding the specificity and scope of Plaintiffs' proposed permanent injunction. Subsequently, this Court issued an order requiring further briefing, in which it detailed specific questions for the parties to answer. [Docket No. 1234.] On the technology front, the parties were asked to expand on their discussion of filtering technology and StreamCast's ability to coax end-users away from legacy (non-filtered) versions of Morpheus Software. On the legal front, the parties were ordered to analyze exhaustively the history of permanent injunctive relief in the context of patent inducement. This briefing has since been received, and the Court has evaluated the pertinent issues. The Court's analysis and conclusions are specified as follows.

## II. BACKGROUND[2]

### A. The Proposed Permanent Injunction

Plaintiffs' proposed permanent injunction is composed of several parts. Under § 1(a)(I) and § 1(a)(ii), StreamCast would be enjoined from directly or indirectly infringing Plaintiffs' copyrighted works in any manner, which also includes StreamCast's "enabling, facilitating, permitting,

---

1. The Plaintiffs are composed of numerous record companies, movie studios, and music publishers.

2. The Court notes that the parties have filed numerous evidentiary objections. As will be made clear below, the Court need not resolve these objections for purposes of this Order.

assisting, soliciting, encouraging, authorizing, inducing, or knowingly materially contributing to" such infringement. Pursuant to § 1(b), StreamCast would be barred from operating the Morpheus System and Software, or any other similar peer-to-peer or file-trading system, until there is a "robust and secure means exhaustively to" stop infringement. According to § 1(c), StreamCast would be required to "use all technologically feasible means to prevent or inhibit" the infringement of Plaintiffs' copyrights by end-users through any version of the Morpheus Software in existence.

Until StreamCast is able to "exhaustively" stop all infringement, it would also be barred from displaying advertising on all Morpheus Software versions.[3] StreamCast must give notice to all of StreamCast's agents and employees, as well as to any entity interested in a transfer of StreamCast's ownership interest in the Morpheus System and Software, and all successors or those acting in concert with them. Any successor in interest to any part of StreamCast's business must also submit to this Court's jurisdiction and venue, and agree to be bound by the injunction. StreamCast could be held in contempt for any violation of the permanent injunction.

### B. StreamCast's Claimed Initial Filtering Efforts

In the September 27, 2006 Order granting Plaintiffs' motion for summary judgment, this Court held that StreamCast distributed the Morpheus Software with the intent to induce copyright infringement. Grokster, 454 F.Supp.2d at 992 ("[N]o reasonable factfinder can conclude that StreamCast provided OpenNap services and distributed Morpheus without the intent to induce infringement."). In support of this conclusion, the record revealed numerous undisputed facts: (1) StreamCast's software was used overwhelmingly for infringing purposes; (2) StreamCast targeted a known community of infringers—former Napster users; (3) StreamCast provided technical assistance to aid users in their enjoyment of illegally downloaded content; (4) StreamCast thwarted enforcement efforts by copyright holders; (5) StreamCast's business model depended on massive infringing use; and (6) StreamCast took no meaningful steps to prevent infringement. Id. at 985–92. The Court concluded that "evidence of StreamCast's objective of promoting infringement is overwhelming." Id. at 992.

After receiving this Court's Order, StreamCast claims that it decided "to the best of its abilities, it should develop and integrate a robust filtering mechanism . . . so that copyrighted works that are not authorized by copyright holders for free downloading or distribution utilizing Morpheus would not be able to be downloaded by Morpheus users." (Weiss Decl. ¶ 4.)[4] Yet, despite taking steps to implement a filter, "StreamCast . . . maintains that any requirement to filter is improper and not

---

**3.** In subsequent briefing, Plaintiffs limited this request to Morpheus software lacking an effective filter.

**4.** Michael Weiss, StreamCast's CEO, does not specify the precise date upon which StreamCast made this determination. There is no dispute that the Plaintiffs held a Local Rule 7–3 conference for the instant permanent injunction motion on November 13, 2006, which was only four days before StreamCast first began distributing a version of the Morpheus Software with a filter. However, StreamCast has also submitted evidence indicating that its plans for instituting a filter were in progress not later than October 20, 2006. (Kassis Decl. ¶ 6 & Ex. B.) Regardless, Weiss's declaration confirms that StreamCast did not consider the utilization of a filter until this Court issued its order holding StreamCast liable for inducement.

required under the law. Accordingly, StreamCast reserves the right to cease distribution of a filtered version." (StreamCast Supp. Opp. at 18 n. 2.)

Plaintiffs have reportedly refused to turn over a list of artists that they wish to have filtered. (Weiss Decl. ¶ 6.) Thus, in order to meet its self-imposed deadline of implementing its filtering mechanism by November 17, 2006, StreamCast's CEO (Weiss) instructed its Director of Technology (Kassis) to copy the names of all artists on the RIAA website. (*Id.*) Stream-Cast asserts that its homemade filter would be even more effective if it were given the "hash values" of files on Morpheus' network that contain Plaintiffs' copyrighted material. (*Id.* ¶¶ 8–9.) Beginning on November 17 and 20, 2006, StreamCast began distributing its new filtering software to Morpheus users. (*Id.* ¶ 7.)[5] On December 15, 2006, StreamCast started sending screenshots to users of "legacy versions" of the Morpheus software stating that it was "strongly recommended" that they click "ok" to accept a software upgrade—this upgrade allegedly contained a filter. (Kassis Decl. ¶ 7.) StreamCast asserts that 92.5% of copyrighted audio and video files were blocked by the filtering versions of the Morpheus Software as of January 14, 2007. (*Id.* ¶ 11.) However, the new filtering software has not replaced all "legacy versions." In fact, StreamCast admits that only about one-third of the downloading sessions in December 2006 and January 2007 were from software that contained this new filter. (*Id.* ¶¶ 8–9.)

In order to develop a list of hash values known to contain infringing content, StreamCast initially ran a "batch process" four times per day. (*Id.* ¶ 16.) These values are derived from the search results generated by end-users. (*Id.*) "Using each artist name as a search term keyword, the batch process scan the P2P networks accessed by Morpheus users and saves all audio and video file hash values obtained from the search results. The hash values are then stored on a hash database server that StreamCast created and maintains." (*Id.* ¶ 19.) When an end-user attempts to download an audio or music video file containing a hash value found in StreamCast's database, the download is "blocked." (*Id.* ¶ 21.) This filtering mechanism is also performed during the uploading process for audio and music video files. (*Id.* ¶ 23.) For TV shows and motion pictures, StreamCast allows the download of any file with DRM protection. (*Id.* ¶ 26.) All other such files are blocked if they either exceed fifteen (15) minutes in running-time (if known) or the file exceeds 100 MB in size. (*Id.* ¶ 27.) All filtering versions of the Morpheus Software are capable of being automatically updated at the end of an individual user's session. (*Id.* ¶ 31.)

During this timeframe, StreamCast also contacted various companies regarding acoustical fingerprinting technology. SNOCAP informed StreamCast that it would be "difficult to determine" the total number of "artist-title pairs" in its collection. Audible Magic allegedly claimed that it could not identify the total number of artist-title pairs in its database. (Weiss Decl. ¶¶ 10–11.) Weiss believes that these two options would, regardless, be "cost-prohibitive." (*Id.* ¶ 12.) StreamCast has also contacted other companies, such as *allmusic.com,* NARM, MUZE, and Gracenote. (*Id.* ¶ 13.) It is not clear from these contacts whether such companies would either be willing to license their information to StreamCast, or if it would be comprehensive enough to cover all

---

**5.** StreamCast has two versions of the Morpheus Software: a free version and one that must be purchased ("Morpheus Ultra"). (*Id.* ¶ 7.)

copyrighted works owned by Plaintiffs. (*Id.* ¶ 14.)

StreamCast also posts warnings on its websites and within the Morpheus System and Software that end-users should download the new filtering software; they are also warned about their potential legal liability for engaging in illegal file sharing. (*Id.* ¶¶ 18, 20.) "StreamCast urges users of non-filtering versions to upgrade to a filtering version each time a user uses a non-filtering version of Morpheus or Morpheus Ultra." (*Id.* ¶ 22.)

Plaintiffs submitted a declaration indicating that in December 2006, after the institution of StreamCast's new filtering software, it was still possible to illegally download each of the Top 40 songs on the Billboard chart. (Zaman Decl. ¶ 4.) After learning of Plaintiffs' declaration, StreamCast claims to have researched the issue. It determined that the artists' names from the RIAA website only included gold and platinum artists. (Weiss Decl. ¶ 15.) "[I]t was possible that current Top 40 artists who did not reach gold and platinum standings would not be on the RIAA website." (*Id.*) StreamCast has since taken steps to add all "Top 40" artist names to its filtering database. (*Id.* ¶ 16.) Additionally, "StreamCast stands ready to include in its filter any artist names, hash values, or file names that the Plaintiffs provide us. Any information provided to StreamCast by Plaintiffs increases the effectiveness of StreamCast's filter." (*Id.* ¶ 17.)

Furthermore, StreamCast claims in its supplemental briefing that it has instituted various other improvements to its filter (*e.g.,* eliminating "low host count files" from the Gnutella network, Morpheus' "select all" downloading feature, and access to the "G2 Network"). (Kassis Supp. Decl. ¶¶ 4–6.) StreamCast also started collecting information about the files passing through its filtering system, and is now running its batch process twelve (12) times per day as opposed to four (4). (*Id.* ¶¶ 7, 9.) StreamCast further asserts that it has added "popular song titles, movies [sic] titles and television titles" to its keyword filter, as well as common misspellings made known to the company. (*Id.* ¶¶ 10, 23.) Finally, StreamCast claims that it has disabled access to video files in excess of 10 minutes in length as of January 18, 2007. (*Id.* ¶ 25.)

### C. The Purported Effectiveness of StreamCast's Filter

A great deal of effort has been expended by the parties in evaluating whether StreamCast's homemade filter is effective, and whether it has been improved since this Court's Order requiring further briefing. Plaintiffs have submitted several declarations in which it is claimed that Morpheus end-users were able to download numerous popular audio and/or video files during December 2006, January 2007, February 2007, March 2007, and April 2007— all after StreamCast first instituted its filtering software. (*See* Zaman Decl.; Zaman Reply Decl.; Patel Decl.; Boyle Decl.; Patel Second Decl.; Bennett Decl.) Plaintiffs have also submitted the declaration of Ellis Horowitz, a computer science professor at the University of Southern California. (Horowitz Decl. Ex. 1.) Although some of his criticisms regarding StreamCast's filter may have since been partly remedied by StreamCast's efforts, he asserts the following implementation flaws: (1) StreamCast filters only by artist, not by title name; (2) StreamCast does not filter common misspellings or variations; (3) StreamCast only collects hashes for its database four times a day; (4) the size filter of 100 MB does not capture 30–minute television shows, especially when StreamCast cannot identify a file's "runtime"; (5) StreamCast does not filter all file types, including ".rar" files that "can

break up large files into numerous pieces, send them in pieces, and then reassemble them on the other end." (*Id.* ¶¶ 27, 32–41.) Horowitz further argues that StreamCast's filter is technologically outdated, substantially because of its failure to incorporate "digital fingerprinting" technology such as acoustical fingerprinting. (*Id.* ¶¶ 42, 47.)

In response, StreamCast claims to have conducted its own in-house testing of the Morpheus filter compared to those utilized by other peer-to-peer networks (in particular, I–Mesh and Kazaa). (Deutscher Decl.; Frawley Decl.; Thompson Decl.) StreamCast has also submitted a statistical analysis of the results. (Mercurio Decl.; Mercurio Supp. Decl.)

### D. Plaintiffs' Proposals Regarding Filtering Technology and Legacy Software

#### 1. Filtering Options

Plaintiffs maintain that StreamCast's "homemade filter" is hopelessly ineffective. They believe that StreamCast should be required to employ commercially available state-of-the-art filtering solutions to prevent infringement by end-users. Plaintiffs offer two related but distinct proposals for the filtering of: (1) audio/music video files, and (2) other video files.

##### a. Audio/Music Video Files

###### i. File Hashes and Acoustical Fingerprinting

First and foremost, Plaintiffs state that StreamCast should be required to incorporate both "acoustical fingerprint" and "file hash" technology into a filter. According to evidence submitted by Plaintiffs, other companies claim to have employed this filtering duo successfully. (*See generally* Sorenson Decl.; Marco Decl.)

Acoustical fingerprinting is licensed by various companies, including Audible Magic. This technology analyzes the actual content of an audio file, as opposed to a written description of what is contained within it (*e.g.*, "metadata"). (Ikezoye Decl. ¶ 3 ("Audible Magic's technology analyzes the shape of the spectrum represented by a digital audio file.").) This means that the filtering tool "listens" to the sound recording, and creates a twenty-second "fingerprint" that can then be compared against any other file that an end-user is attempting to upload or download. (*Id.* ¶ 8.) If the suspected file has that precise sequence (or spectrum) of sounds, the uploading or downloading of the song will be blocked. According to Plaintiffs, Audible Magic has a database of approximately 6 million acoustical fingerprints of musical sound recordings. (*Id.* ¶ 11.)

The second part of this filtering system is the "file hash." This represents a different type of "fingerprint." "A hash value is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value." *United States v. Cartier*, 2007 WL 319648, at *1 (D.N.D. Jan.30, 2007). This fingerprint is not based on the actual sound/content of the recording, but constitutes a mixture of characters that allow the file to be easily identified, and remains the same for *identical* copies of that file (after they are uploaded or downloaded).

The file hash is a fairly limited tool. In order to explain its usefulness, the Court constructs the following hypothetical: assume that there is a two minute sixteen second version of Louis Armstrong singing "What a Wonderful World" available for download through the Morpheus System and Software, which has a hash value of 123456789. If any other individual downloads this precise file, and makes no alterations to it, his/her downloaded copy will contain the same file hash: 123456789. Companies such as Audible Magic claim to

have a database of file hashes that are known to contain copyrighted content. Therefore, if file hash 123456789 is already contained in an Audible Magic database, and StreamCast purchases the right to license this information, a Morpheus end-user should be prevented from downloading this precise copy of the song. However, an end-user with this two minute sixteen second copy of "What a Wonderful World" could decide to recopy the song such that it only lasts for two minutes fifteen seconds. This one second alteration would automatically cause the derivative file to be associated with a *different* file hash [6]—for example, 012345678. If StreamCast relied entirely on file hash filtering, then the derivative version of "What a Wonderful World" with hash value 012345678 would evade the filtering gatekeeper mechanism.

The file hash filter serves as a useful starting point according to Plaintiffs. It theoretically gives StreamCast the ability to start with a number of computer files that are known to contain infringing content. This is where the acoustical fingerprinting technology arrives at center stage.

In following from the original hypothetical, the Court presumes that Audible Magic has created a twenty-second audio fingerprint of "What a Wonderful World," which comes from the file containing hash value 123456789. Because this fingerprint is based on the spectrum of sounds contained in the sound recording, it can also be "matched up" with the file associated

with hash value 012345678. Thus, the filtering tool would recognize all files, regardless of the hash value, that contain this "acoustical fingerprint" of What a Wonderful World.[7] Audible Magic represents that its acoustical fingerprinting technology "would successfully block well over 99% of the files unauthorized for peer-to-peer distribution." (Ikezoye Decl. ¶ 18.)

### ii. Keyword Filtering

Keyword filtering is merely a supplement to the acoustical fingerprinting and hash value filtering tools, and would be ineffective by itself. Every file has "metadata," which contains certain information about itself (*e.g.*, artist, song title, etc.). By having a filter that matches files against certain keywords of known artist/song titles found in the metadata, StreamCast would be better positioned to identify infringing content. (Marco Decl. ¶¶ 11–12; Sorenson Decl. ¶ 17.)

This information can be easily altered. Unknown misspellings of artist names and song titles could escape the filter. But according to Plaintiffs, keyword filtering is sometimes the best method for locating illegally "leaked" pre-release copies of sound recordings that have yet to be added to the acoustical fingerprint database.

### iii. "Quality Improvement Process"

Plaintiffs argue that filtering technologies evolve rapidly, and are fine-tuned to incorporate state-of-the-art technology and to overcome the efforts of would-be infringers to defeat the filtering tools.

---

6. The same would occur if a second copy of the song was precisely the same length as the original, but less memory (or a lower "bit rate") was devoted to creating the copy, meaning that the derivative file would be of a lesser quality. *Any* change would apparently cause the resulting file to be associated with a new hash.

7. It is important to note that this technology would only work with respect to all file copies containing the *same version* of the song's recording. Thus, the acoustical fingerprint for a studio-recorded version of "What a Wonderful World" would seemingly be different from that of a live concert recording. (Ikezoye Decl. ¶ 5.) However, StreamCast claims that acoustical fingerprinting does not work for live recordings. (Kassis Supp. Decl. ¶ 26.)

Plaintiffs explain that StreamCast should be required to update the lists of blocked files on a routine basis. This information can be obtained from third-party sources such as Audible Magic. It can also result from an agreement with StreamCast that would allow the record companies to modify the block list, and require StreamCast to implement it immediately. This would help ensure that the list is not overinclusive or underinclusive.

### b. Video Files

The motion picture Plaintiffs begin by noting that commercial vendors are rapidly developing filtering techniques for video downloads. Audible Magic uses the same kind of acoustical fingerprinting for such files. (Izekoye Decl. ¶ 24.) In a declaration, Audible Magic asserts that it has over 1000 acoustic fingerprints for motion pictures and television shows, and in the near future it will likely expand to a large number of Plaintiffs' "most popular" titles. (*Id.* ¶ 26.) Additionally, it appears that technology is developing that may allow for "video fingerprinting." This presumably means that the filter would have in its database a visual "snapshot" of the film, which could then be compared against other files end-users are attempting to upload and download. (*See* Winter Decl. ¶ 7.) Companies such as Philips, Vobile, and Gracenote are in the process of trying to use acoustical fingerprinting, video fingerprinting, or both in order to make filtering more successful. (Plaintiffs' Supp. Brief at 10.)

The motion picture Plaintiffs suggest an injunction in two parts, which would be subject to reexamination after 180 days. First, StreamCast should be ordered to utilize commercially available acoustical fingerprinting technology for those video titles currently protected. To protect works not currently fingerprinted in this manner, Plaintiffs ask that StreamCast perform the following: (1) use commercially available solutions for creating and supplementing a database of hashes that have been verified as infringing or likely to contain infringing content, (2) block files that are longer than 10 minutes in length or larger than 40 megabytes in size, and (3) use a supplemental keyword search based on terms submitted by the Plaintiffs.

Second, Plaintiffs ask that this Court order the parties to submit briefing in 180 days after the injunction is entered in order to determine whether a status conference is necessary in light of technological advances.[8]

### c. What Happens if the Filter Fails?

Plaintiffs' proposed injunction previously required StreamCast to "exhaustively" stop all infringement. However, this Court questioned whether such language would leave StreamCast liable for infringement even if it accepts a third-party filtering system approved by Plaintiffs, but is not itself "perfect." Plaintiffs assert that they would not hold StreamCast liable in such circumstances, but *only if* StreamCast: (1) properly installs, implements, and maintains the third-party filter and available updates/upgrades, (2) takes into account reasonably foreseeable deficiencies with a filtering solution, and (3) implements technological improvements as they become available.

If Plaintiffs believe that StreamCast has not acted in good faith, then Plaintiffs vaguely suggest that the Court's injunction include a "mandated notice-and-cure pro-

---

**8.** Given the time this Court has expended considering the motion, the Court recognizes that: (1) Audible Magic's database of acoustical fingerprints for video files may be more comprehensive; (2) *other companies may* have had success with video/acoustical fingerprints; and (3) the movie studio Plaintiffs' position with regard to the injunction and video files may generally be different.

cedure pursuant to which Plaintiffs would give StreamCast written notice of such problems and StreamCast would have a certain amount of time to cure the problems or otherwise respond." (Plaintiffs' Supp. Brief at 15.) It is not clear to the Court how exactly this procedure would work. Lastly, Plaintiffs do not believe that they should bear the burden of providing artist-title pairs or hash values to StreamCast for a "homemade filter."

### 2. Legacy Software

#### a. Encouraging Morpheus Users to Upgrade

StreamCast states that it cannot require users to upgrade their software to versions containing a filter. Similarly, declarations submitted by *Plaintiffs* reveal that some of StreamCast's apparent competitors, I–Mesh and Kazaa, are unable to do so as well. (Sorenson Decl. ¶ 20 ("Sharman did not have a technical means to force users to upgrade.").; Marco Decl. 119 ("As a result of these efforts, our sense is that there are at most hundreds or thousands of customers still using the legacy software and that small number becomes smaller still over time.").). Plaintiffs do not currently seek such relief. (*See* Plaintiffs' Supp. Brief at 17 n. 7.) Instead, Plaintiffs ask this Court to include three conditions in its forthcoming injunction Order. First, StreamCast should insert aggressive "pop-ups" that would make it difficult (or at least very annoying) for users to continue with the unfiltered versions of the Morpheus software. Second, Plaintiffs ask that StreamCast copiously remove all postings in the "Morpheus Forum" that help users to download non-filtering versions of Morpheus. Third, StreamCast should be forced to distribute do-not-infringe messages as search results, so that users who continue to search for copyrighted material are given a warning not to infringe.

#### b. Advertising

Plaintiffs ask that StreamCast be denied the right to sell advertising on the legacy versions of the Morpheus software.

## III. ANALYSIS

### A. Legal Standard

Under 17 U.S.C. § 502(a), this Court is empowered to grant a permanent injunction "as it may deem reasonable to prevent or restrain infringement of a copyright." "It goes without saying that an injunction is an equitable remedy." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id.* at 312, 102 S.Ct. 1798 (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456, 39 S.Ct. 142, 63 L.Ed. 354 (1919)).

As recently confirmed by the Supreme Court, Plaintiffs must meet their burden with respect to the traditional four-part test. Plaintiffs "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *Id.* at 1841. Further, the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 1840.[9]

9. StreamCast has argued that "whether the terms of an injunction fulfill the mandates of

## B. Application of the Four–Part Test

Before applying *eBay*, it must be noted that Plaintiffs also ask this Court first to apply an arguably different (and perhaps more permissive) permanent injunction test. Prior to *eBay*, in *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir.1993), the Ninth Circuit stated that "[a]s a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." Consistent with the Ninth Circuit, Nimmer writes, "[i]t is uncontroversial that a 'showing of past infringement and a substantial likelihood of future infringement' justifies issuance of a permanent injunction." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 14.06[B] & n. 76.1 (quoting *Superhype Pub., Inc. v. Vasiliou*, 838 F.Supp. 1220, 1226 (S.D.Ohio 1993)); *see also id.* § 14.06[B] ("Because a permanent injunction is issued only after liability is established, its issuance probably does not require a showing of irreparable injury.").

In light of this two-part rule (past infringement + likelihood of future infringements), Plaintiffs have asked for a permanent injunction. However, this Court has doubts that *MAI's* "general rule" regarding permanent injunctions survives *eBay*. In *eBay*, the Supreme Court rejected the Federal Circuit's "general rule" in patent cases that "courts will issue permanent injunctions against patent infringement absent exceptional circumstances." 126 S.Ct. at 1839–40 (citation omitted). As stated in Chief Justice Roberts's concurrence, the "historical practice" of granting permanent injunctive relief in most instances after the establishment of infringement "does not *entitle* a patentee to a permanent injunction or justify a general rule that such injunctions should issue." *Id.* at 1841 (Roberts, C.J., concurring).

 The Supreme Court also stated that permanent injunctions issued under the Patent Act should be treated as they are under the Copyright Act,[10] and that the traditional four-part test must be applied. Additionally, the Ninth Circuit has applied *eBay* to the Lanham Act. *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137–38 (9th Cir.2006). By implication, the four *eBay* factors are the only relevant considerations for purposes of Plaintiffs' instant motion under the Copyright Act. This Court can identify no place for a separate and distinct two-part *MAI* test or "general rule" that could circumvent *eBay*. *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir.2007) (applying *eBay* and rejecting plaintiff's assertion that "when copyright infringement has been proved and there is a threat of continuing in-

---

Rule 65(d) is a question of law" reviewed *de novo*. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1315 (Fed.Cir.2004). This standard is irrelevant, however, because it is a matter for appellate review. Furthermore, the Court notes that an order granting a permanent injunction, as well as the decision regarding which terms should be included or omitted, are reviewed for an abuse of discretion or application of erroneous legal principles. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir.2004); *Bates v. United Parcel Serv., Inc.*, 465 F.3d 1069, 1092 (9th Cir.2006). Rule 65(d) *de novo* review only applies to the specificity of the injunction's terms. *Premier Communications*

*Network, Inc. v. Fuentes*, 880 F.2d 1096, 1100 (9th Cir.1989). Finally, the Ninth Circuit "will not set aside injunctions under Rule 65(d) 'unless they are so vague that they have no reasonably specific meaning.'" *United States v. V–1 Oil Co.*, 63 F.3d 909, 913 (9th Cir.1995) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir.1992)).

**10.** This is because both the Patent Act and the Copyright Act similarly grant district courts the discretion to impose permanent injunctions. *See id.* at 1839–40 (citing 35 U.S.C. § 283; 17 U.S.C. § 502(a)).

fringement, the copyright holder is *'entitled* to an injunction' ") (citations omitted). See also *Nat'l League of Junior Cotillions, Inc. v. Porter,* 2007 WL 2316823, at *5 (W.D.N.C. Aug.9, 2007) ("The Fourth Circuit more recently reaffirmed [in *Phelps*] the traditional showing that a plaintiff must make to obtain a permanent injunction in copyright cases."). *MAI* should only be relevant to the extent it informs the *eBay* analysis.

### 1. Irreparable Harm

The first question to address is whether Plaintiffs "ha[ve] suffered an irreparable injury." *eBay,* 126 S.Ct. at 1839. "The concept of irreparable harm, unfortunately, 'does not readily lend itself to definition.' " *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th Cir.2001) (citation omitted). According to the Fifth Circuit, "[b]y definition, 'irreparable injury' is that for which compensatory damages are unsuitable." *Wildmon v. Berwick Universal Pictures,* 983 F.2d 21, 24 (5th Cir.1992). Or, as alternatively stated by the Seventh Circuit, "[o]nly harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm." *Am. Hosp. Ass'n v. Harris,* 625 F.2d 1328, 1331 (7th Cir.1980). In perhaps combining these two statements, the Tenth Circuit has observed that "irreparable harm is often suffered when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits." *Prairie Band,* 253 F.3d at 1250 (internal quotation marks and citations omitted). One district court has also recently stated that "the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff." *Smith & Nephew, Inc. v. Synthes (U.S.A.),* 466 F.Supp.2d 978, 982–83 (W.D.Tenn.2006), thereby linking the first *eBay* factor with the second. Based on these varying definitions, the Court now proceeds to its irreparable harm analysis.

#### a. There is no Presumption of Irreparable Harm

■ The parties dispute whether, in light of *eBay,* irreparable harm can be presumed.

*Pre-eBay and Post-eBay Permanent Injunction cases:* Other courts have in the past presumed the existence of irreparable injury upon the establishment of liability in copyright cases. *See, e.g., Twentieth Century Fox Film Corp. v. Streeter,* 438 F.Supp.2d 1065, 1072 (D.Ariz.2006) ("Accordingly, when seeking a permanent injunction in copyright cases, irreparable harm is presumed on a showing of success on the merits."); *Elektra Entertainment Group, Inc. v. Bryant,* 2004 WL 783123, at *6 (C.D.Cal. Feb.13, 2004) ("Copyright infringement is presumed to give rise to irreparable injury. Accordingly, when seeking a permanent injunction in copyright cases, irreparable harm is presumed on a showing of success on the merits.") (internal citation omitted). As pointed out by Plaintiffs, this Court once essentially agreed with this analysis. *See Warner Bros. Entertainment Inc. v. Caridi,* 346 F.Supp.2d 1068, 1073 (C.D.Cal.2004) (Wilson, J.) (entering a permanent injunction after a default judgment in a copyright action).

Yet, these cases were all decided prior to the Supreme Court's decision in *eBay.*[11]

---

11. *Streeter, Elektra,* and *Caridi* were all cases in which a' permanent injunction was granted after default judgment. The Seventh Circuit has criticized, after *eBay,* the sometimes-automatic practice of granting permanent injunctions after default judgment. *See e360 Insight v. The Spamhaus Project,* 500 F.3d 594, 603–04 (7th Cir.2007) ("The district court concluded that e360's success by default and the failure of Spamhaus to interpose objections to relief simply entitled e360 to a permanent injunction. We conclude that a more sub-

The *eBay* Court held that it is Plaintiffs who "must demonstrate" (meaning, have the burden of proof) that the traditional factors favor a permanent injunction. 126 S.Ct. at 1839 The Supreme Court also highlighted that it has "consistently rejected" the rule that "an injunction automatically follows" an infringement holding. *Id.* at 1840. Given Plaintiffs' burden of proof and the inability of a district court to "automatically" issue injunctions, it is perhaps unclear in *eBay's* wake whether a permanent injunction can be granted based on a rebuttable presumption of irreparable harm. On remand from the Supreme Court, the *eBay* district court highlighted this uncertainty by initially expressing the following concerns:

> [T]he legal standard for issuing an injunction was in flux throughout the appeal of this matter and appears to remain uncertain today in that the Supreme Court did not expressly address whether the presumption of irreparable harm upon a showing of validity and infringement survives the Supreme Court's decision.

*Mercexchange, L.L.C. v. eBay, Inc.,* 467 F.Supp.2d 608, 615 n. 7 (E.D.Va.2006).

However, the *eBay* district court has subsequently decided that there can be no presumption of irreparable harm in the permanent injunction context. *See MercExchange, L.L.C. v. eBay, Inc.,* 500 F.Supp.2d 556, 568 (E.D.Va.2007) ("[A] review of relevant caselaw, as well as the language of the Supreme Court's decision, supports defendants' position that such presumption no longer exists."). This view appears to have been followed by perhaps every court expressly considering *eBay.*[12] *See IMX, Inc. v. LendingTree, LLC,* 469 F.Supp.2d 203, 224 (D.Del.2007) (describing the "now-overturned presumption that a patent holder is irreparably harmed upon a finding of infringement"); *Paice, LLC v. Toyota Motor Corp.,* 2006 WL 2385139, at *4 (E.D.Tex. Aug.16, 2006) ("The *eBay* decision demonstrates that no presumption of irreparable harm should automatically follow from a finding of infringement."); *z4 Technologies, Inc. v. Microsoft Corp.,* 434 F.Supp.2d 437, 440 (E.D.Tex.2006) ("This language does not imply a presumption, but places the burden of proving irreparable injury on the plaintiff.").

This Court agrees with StreamCast, and these district courts, that the presumption of irreparable harm no longer inures to the benefit of Plaintiffs. The *eBay* Court plainly stated that Plaintiffs "must demonstrate" the presence of the traditional factors, and therefore have the burden of proof with regard to irreparable harm. If this Court adopted a presumption of irreparable harm in favor of Plaintiffs, then StreamCast would effectively have the burden of proving the contrary. Such a rule would contravene the Supreme Court's intent that Plaintiffs establish not merely that infringement causes "harm," but how it amounts to *irreparable* harm.[13]

---

stantial inquiry by the district court was necessary prior to the entry of equitable relief.").

**12.** The Court has identified *Capitol Records, Inc. v. Zahn,* 2007 WL 542816, at *4 (M.D.Tenn. Feb.16, 2007), as a possible aberration. However, *Capitol Records* made no express or implied reference to *eBay* in its analysis. Additionally, the district court in *UMG Recordings, Inc. v. Blake,* 2007 WL 1853956, at *2–3 (E.D.N.C. June 26, 2007), applied a presumption of irreparable harm. While noting *eBay's* existence, the *UMG* Court

failed to offer any reason why a presumption could still be utilized.

**13.** Therefore, this Court is not persuaded by the Eighth Circuit's pre-*eBay* conclusion in *Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 968 (8th Cir.2005), that because "[a plaintiff] certainly has the right to control the use of its copyrighted materials, . . . irreparable harm inescapably flows from the denial of that right." In substance, such language is nothing more than a disguised presumption, particularly with the use of the

*Analogy to Preliminary Injunction Cases:* In arguing for a presumption, Plaintiffs also cite to various preliminary injunction cases within the Ninth Circuit that predate *eBay.* In these cases, the Ninth Circuit held that "a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173, 1174 (9th Cir.1989); *see also LGS Architects, Inc. v. Concordia Homes of Nev.,* 434 F.3d 1150, 1155–56 (9th Cir.2006) (same); *Micro Star v. Formgen Inc.,* 154 F.3d 1107, 1109 (9th Cir.1998) (same). Plaintiffs' citations are unpersuasive. First, prior preliminary injunction cases issued by the Ninth Circuit are of no moment when this Court is faced with a more recent Supreme Court decision that is directly on point, and which requires a different holding.

Second, one might reasonably argue that there is a sensible policy rationale for permitting a presumption of irreparable harm in preliminary injunction, but not permanent injunction, motions. As stated by the Fourth Circuit:

> Unlike a permanent injunction, which resolves the merits of a claim and imposes an equitable remedy because a legal one is inadequate, a preliminary injunction maintains a particular relationship between the parties *in anticipation* of a decision on the merits, pending completion of the litigation.

*United States Dep't of Labor v. Wolf Run Mining Co.,* 452 F.3d 275, 280 (4th Cir. 2006) (internal citation omitted). Preliminary injunctions are typically requested when a lawsuit's factual development is limited and are designed to preserve the status quo pending trial. Relatedly, preliminary injunctions are also temporary in the sense that they will expire once the case's merits are decided. Given these considerations, one could legitimately conclude that a plaintiff should be absolved of proving irreparable harm at such an early stage.[14]

Third, the longstanding rule that irreparable harm can be presumed after a showing of likelihood of success for purposes of a copyright preliminary injunction motion may *itself* have to be reevaluated in light of *eBay.* It is true that post-*eBay,* the Federal Circuit assumed the continued existence of a presumption of irreparable harm for preliminary injunctions. *See Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1347 (Fed.Cir.2006) ("First, as noted above, we conclude that Abbott has not established a likelihood of success on the merits. As a result, Abbott is no longer entitled to a presumption of irreparable harm.")[15]; *see also Docusign, Inc. v. Sertifi, Inc.,* 468 F.Supp.2d 1305, 1309 n. 6 (W.D.Wash.2006) ("*Abbott,* which came after *eBay,* assumed (without deciding) that such a presumption was still appropriate in the preliminary injunction context, where a strong showing of likely infringement was made."). And some district courts have also rejected *eBay's* application to preliminary injunctions. *E.g., Christiana Industries v. Empire Electronics, Inc.,* 443 F.Supp.2d 870, 884 (E.D.Mich.2006) ("Defendant asserts that in [*eBay*], the Supreme Court eliminated the presumption of irreparable harm for preliminary injunc-

word "inescapably." After *eBay,* Plaintiffs cannot rely on the pure fact of infringement in order to establish irreparable harm.

**14.** There are of course arguments to the contrary, such as the fact that a defendant could be enjoined from engaging in a certain activity even though he/she is ultimately vindicated at trial. The Court's discussion is not meant to be exhaustive, but merely offers possible reasons for why some might treat preliminary and permanent injunctions differently.

**15.** Since the Federal Circuit can only bind this Court in patent cases, *Abbott* is only relevant to the extent it is persuasive.

tions upon a showing of validity and infringement. Plaintiff argues, and this Court agrees, that *eBay* did not invalidate the presumption.").

However, a significant number of lower court cases are reaching precisely the contrary conclusion. *See, e.g., Sun Optics, Inc. v. FGX Int'l, Inc.*, 2007 WL 2228569, at *1 (D.Del. Aug.2, 2007) ("Even if the moving party succeeds in demonstrating a likelihood of success on the merits, the notion that there follows a presumption of irreparable harm seems inconsistent with the Supreme Court's holding in [*eBay* ]."); *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F.Supp.2d 871, 881 (D.Minn. 2007) ("[T]he Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction."); *Allora, LLC v. Brownstone, Inc.*, 2007 WL 1246448, at *5 (W.D.N.C. Apr.27, 2007) ("Until this issue is clarified by the Fourth Circuit or the Supreme Court, this Court will not *presume* irreparable harm and likelihood of success on the merits following a prima facie showing of copyright infringement, but will instead treat copyright cases in the same manner as any other civil action requesting a preliminary injunction."); *Chamberlain Group, Inc. v. Lear Corp.*, 2007 WL 1017751, at *5 (N.D.Ill. Mar.30, 2007) ("While *eBay* has yet to be completely fleshed out in the lower courts, it has been applied to preliminary, as well as permanent, injunctions, and has been read to limit the presumption of irreparable harm solely upon the finding of infringement.") (internal citation omitted).[16] The law is muddled, and the Court is not aware of a post-*eBay* Ninth Circuit ruling on this point. Certainly, the post-*eBay* legal landscape has created some question as to the viability of these Ninth Circuit preliminary injunction decisions.

*Amoco* and *eBay:* The argument that *eBay* bars a presumption of irreparable harm with regard to permanent or preliminary injunction motions is strengthened when considered in conjunction with the Supreme Court's prior opinion in *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In *Amoco*, the Ninth Circuit entered a preliminary injunction after determining that the Secretary of the Interior likely violated Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"). *Id.* at 534, 107 S.Ct. 1396. In reaching this conclusion, the Ninth Circuit applied a presumption of irreparable harm. The Supreme Court reversed and held that "[t]his presumption is contrary to traditional equitable principles and has no basis in ANILCA." *Id.* at 545, 107 S.Ct. 1396.

Prior to *eBay*, *Amoco* appears to have had little impact. In *Sierra Club v. United States Forest Service*, 843 F.2d 1190 (9th Cir.1988), the Ninth Circuit signaled that *Amoco* might be limited to ANILCA and should not be extended even to National Environmental Policy Act ("NEPA") cases. *Id.* at 1195; *see also Pub. Serv. Co. of Colo. v. Andrus*, 825 F.Supp. 1483, 1505 (D.Idaho 1993) ("The Ninth Circuit has questioned the applicability of the *Amoco* decision in NEPA cases."). There was perhaps little reason to think that *Amoco* would be relevant to intellectual property cases.

But in *eBay*, the Supreme Court cited to *Amoco* twice. *Amoco* was cited first, as support for the four factors that a plaintiff must demonstrate before district courts can grant a permanent injunction, and second, to help justify the proposition that a

---

**16.** *See also Porter*, 2007 WL 2316823, at *5 n. 14 (cataloguing these and other cases in which *eBay* has or has not been applied to bar

a presumption of irreparable harm on motions for preliminary injunctions).

departure from traditional equity practice should not be "lightly implied." *eBay*. 126 S.Ct. at 1839 (citing *Amoco*, 480 U.S. at 542, 107 S.Ct. 1396). The *eBay* Court relied on *Amoco* in this manner even though it was a preliminary injunction case. *eBay's* invocation of *Amoco* suggests that permanent and preliminary injunctions should generally be treated alike.

*eBay* and *Amoco* also have important parallels. *Amoco* held that a presumption of irreparable harm for a preliminary injunction is "contrary to traditional equitable principles." 480 U.S. at 545, 107 S.Ct. 1396. *eBay* does not speak in the language of presumptions and only expressly states that "traditional equitable considerations" militate against the "automatic" issuance of permanent injunctions. 126 S.Ct. at 1840. But as already discussed, *eBay* is in implicit agreement with *Amoco* on the presumption question (in the permanent injunction context) because it clearly places the burden of proof on the plaintiff. *Id.* at 1839.[17]

Furthermore, these cases stand together for the principle that a district court should not depart from a traditional analysis of the relevant equitable factors, whether for a preliminary or a permanent injunction, unless directed to do so by statute. *See eBay*, 126 S.Ct. at 1839 ("[A] major departure from the long tradition of equity practice should not be lightly implied") (quoting *Weinberger*, 456 U.S. at 320, 102 S.Ct. 1798); *Amoco*, 480 U.S. at 542, 107 S.Ct. 1396 ("[W]e do not lightly assume that Congress has intended to depart from established principles.") (quoting *Weinberger*, 456 U.S. at 313, 102 S.Ct. 1798). Policy considerations aside, there is nothing in the text of Section 502 evidencing a departure from traditional equitable practices for either a preliminary or a permanent injunction. Section 502(a) merely states that a district court "may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Based on *eBay* and *Amoco*, there is no language in the text of the Copyright Act that would permit a departure from traditional equitable principles such that a presumption of irreparable harm would be allowed in any injunctive context.

Thus, *Amoco* provides additional doctrinal support for rejecting a presumption of irreparable harm in permanent injunction cases, and further reduces the import of Plaintiffs' pre-*eBay* preliminary injunction citations.

### b. Irreparable Harm has been Established [18]

■ Irreparable harm cannot be established solely on the fact of past infringe-

---

**17.** Quite recently, the Ninth Circuit also issued an opinion in which *eBay* and *Amoco* were analyzed together for what appeared to be a permanent injunction. *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir.2007). The opinion favorably quotes *Amoco's* antipresumption language. *Id.* at 843–45.

**18.** It should be noted that the *eBay* Court compelled district courts to evaluate whether a given plaintiff "has suffered irreparable injury." 126 S.Ct. at 1839. The phrase "has suffered" suggests that this Court should consider whether past infringement resulting from StreamCast's inducement, for which lia-

bility has been imposed, caused irreparable harm. Had the Supreme Court wanted district courts to analyze the irreparable harm that might flow from future infringements, it could have 21 easily said so.

This reading of *eBay* has some advantages, since harm suffered in the past may frequently be the best method for determining how future harm would impact Plaintiffs. But a consideration of future events may in some instances be the only way of determining whether irreparable harm will be suffered. And regardless of any irreparable harm suffered in the past, it seems that a permanent injunction should not issue unless there is reason to believe that future infringements

ment. Additionally, it must also be true that the mere likelihood of future infringement by a defendant [19] does not by itself allow for an inference of irreparable harm. As to the latter, future copyright infringement can always be redressed via damages, whether actual or statutory. *See* 17 U.S.C. § 504. To the extent that future infringement is relevant to the analysis, the onus is on Plaintiffs to explain why future infringements resulting from StreamCast's inducement would cause *irreparable* harm. It cannot be presumed. For example, in a recent patent infringement case in the Eastern District of Texas, the district court held that the defendant's continued infringement of plaintiff's patent would cause irreparable harm due to the "[l]oss of market share in this nascent market" for digital video recorders. *TiVo Inc.*, 446 F.Supp.2d at 669. Importantly, the *TiVo* Court did not make a finding of irreparable harm based on the simple fact of continued infringement, which could be

compensated for with an award of damages.

"[I]rreparable harm may not be presumed[, but] [i]n run-of-the-mill copyright litigation, such proof should not be difficult to establish...." 6 Patry, *supra*, § 22:74. Thus, Plaintiffs may establish an irreparable harm stemming from the infringement (*e.g.*, loss of market share, reputational harm). It is also possible that some qualitative feature about the infringement itself, such as its peculiar nature, could elevate its status into the realm of "irreparable harm."

StreamCast accepts that certain harms caused by infringement, such as loss of brand recognition and market share, can amount to irreparable harm. (StreamCast Opp. at 10.) However, StreamCast rejects the argument that copyright infringement can itself ever represent irreparable harm. StreamCast asserts that "[i]f damages can be calculated,

would constitute irreparable harm. *See* 6 William F. Patry, *Patry on Copyrights*, § 22:78 ("[M]onetary damages are awarded for past harm, while injunctive relief is intended to prevent future harm."); 4 Nimmer & Nimmer, *supra*, § 14.06[B] ("Under Section 502(a) of the Copyright Act, the prevailing plaintiff in a copyright infringement action may obtain, in addition to a monetary recovery, a permanent injunction restraining further infringement."); *cf. Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1565 (Fed.Cir.1984) ("Ordinarily an injunction is designed to prevent future infringement, and damages are awarded as compensation for past infringement.").

Not surprisingly, there are examples of courts examining irreparable harm from the perspective of past infringement, future infringement, or both. *See Smith & Nephew, Inc.*, 466 F.Supp.2d at 983 ("The loss of market share and the resulting lost profits and loss of brand name recognition which Smith & Nephew *suffered* because of Synthes' continued sale of the infringing products constitute injuries that are both incalculable and irreparable.") (emphasis added); *TiVo Inc. v. EchoStar Communications Corp.*, 446

F.Supp.2d 664, 669 (E.D.Tex.2006) ("Plaintiff has demonstrated ... that it *continues to suffer* irreparable harm in the absence of an injunction ....") (emphasis added); *Muniauction, Inc. v. Thomson Corp.*, 2007 WL 2225847, at *2 (W.D.Pa. July 31, 2007) ("[W]e find that plaintiff *has suffered, and will continue to suffer,* harm to its reputation for innovation as a result of defendants' infringement.") (emphasis added); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir.2006) ("So long as www.audisport.com stayed online, there was *potential for future harm,* and therefore, there was no adequate remedy at law.") (emphasis added).

In the end, the Court need not resolve this nicety. As explained immediately below, Plaintiffs have established that they: (1) have suffered irreparable harm from past infringements resulting from StreamCast's inducement; and (2) would suffer further irreparable harm from future infringements caused by StreamCast's inducement.

19. As explained in Part III.B.3, *infra*, the Court finds that further infringements are likely to be induced by StreamCast.

the injury is **not** irreparable ...—the Copyright Act specifically provides for statutory damages, which are calculable assuming Plaintiffs can prove direct infringement of their works, and a basis for the range requested." (*Id.*) This Court has doubts regarding StreamCast's position. In *eBay*, Chief Justice Roberts indicated that irreparable harm can result from the infringement itself, depending upon the circumstances of the case:

> From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This "long tradition of equity practice" is not surprising, given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes-a difficulty that often implicates the first two factors of the traditional four-factor test.

126 S.Ct. at 1841 (Roberts, C.J., concurring); *see also MercExchange*, 500 F.Supp.2d at 568 ("[T]he court is not blind to the reality that the nature of the right protected by a patent, the right to exclude, will frequently result in a plaintiff successfully establishing irreparable harm in the wake of establishing validity and infringement."); *cf. Muniauction, Inc.*, 2007 WL 2225847, at *2 ("Even though we may not categorically enter an injunction solely because plaintiff's patent has been infringed, we may still consider this to be a relevant factor in our analysis under the four-factor test."). And "[l]ike a patent owner, a copyright holder possesses 'the right to exclude others from using his property.'" *eBay*, 126 S.Ct. at 1840 (citation omitted); *see also Grokster*, 454 F.Supp.2d at 997 ("The right to exclude is inherent in the grant of a copyright.").

This Court also recognizes that a competing *eBay* concurrence took issue with Chief Justice Roberts's "right to exclude" language. Justice Kennedy explained his view that "the existence of a right to exclude does not dictate the remedy for a violation of that right." *eBay*, 126 S.Ct. at 1842 (Kennedy, J., concurring). This Court agrees, since a contrary conclusion would come close to permitting a presumption of irreparable harm. This Court also observes that Justice Kennedy's statement was made primarily in the context of certain recent developments in the patent field that are wholly inapplicable to this lawsuit. For example, this is simply not a case in which the copyright infringement represents "but a small component of the product the companies seek to produce," such that "legal damages may well be sufficient to compensate for the infringement." *Id.* As this Court previously held, StreamCast's entire business was built around the fundamental premise that Morpheus would be utilized to infringe copyrights, including those owned by Plaintiffs. Furthermore, Justice Kennedy emphasized that "[t]he equitable discretion over injunctions ... is well suited to allow courts to adapt to the rapid technological and legal developments...." *Id.* Given the technological aspects of the infringement induced by StreamCast, and the flexibility conferred by the Copyright Act, this Court is persuaded that its bases for finding irreparable harm, *infra*, are supported by both Chief Justice Roberts's and Justice Kennedy's concurrences.

In light of this authority, the Court concludes that certain qualities pertaining to the nature of StreamCast's inducement of infringement are relevant to a finding of irreparable harm. As stated before, the Court disagrees with the Eighth Circuit's categorical pronouncement in *Taylor* that "irreparable harm inescapably flows from the denial" of "the right to control the use of its copyrighted materials." *See supra* note 13 (quoting *Taylor*, 403 F.3d at 968). After *eBay*, the word "inescapably" simply goes too far. However, infringement may

still occur in such a manner that it has the actual effect of irreparably harming a plaintiff's right to control the use of his/her copyrighted material.

The irreparable harm analysis centers on two basic themes: (1) StreamCast has and will continue to induce far more infringement than it could ever possibly redress with damages; and (2) Plaintiffs' copyrights (especially those of popular works) have and will be rendered particularly vulnerable to continuing infringement on an enormous scale due to StreamCast's inducement. The Court agrees with both arguments, and each is independently sufficient to support of finding of irreparable harm in this case.

First, the Court must ask whether a particular defendant's probable inability to pay damage constitutes irreparable harm. In the ordinary case, "merely alleging an opponent's inability to pay damages does not constitute irreparable harm." *Rosewood Apartments Corp. v. Perpignano*, 200 F.Supp.2d 269, 278 (S.D.N.Y.2002). But "[i]n some limited circumstances, parties have demonstrated such a strong likelihood that their opponent will be unable to pay that courts have awarded them equitable relief." *Id.* For example, in another copyright infringement case, the district court found that the harm from infringement "will not be remedied by a damage award that may or may not be collectible." *See Lava Records LLC v. Ates*, 2006 WL 1914166, at *3 (W.D.La. July 11, 2006). The rationale in such cases must be that an award of monetary damages will be meaningless, and the plaintiff will have no substantive relief, where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant.

Plaintiffs have not yet sought an award of statutory damages. Additionally, Plaintiffs have not provided this Court with specific evidence as part of this motion demonstrating that StreamCast would be unable to pay damages for the infringements it has induced in the past, and could continue to induce in the future. But such evidence is not necessary here. Based on the undisputed evidence at summary judgment of massive end-user infringement, it is highly likely that the award of statutory damages that ultimately befalls StreamCast in this case will be enormous (especially considering the potential relationship between inducement and a finding of willfulness), and would far outstrip the amount of revenue the company has garnered in recent years. *See Grokster*, 454 F.Supp.2d at 982–83. This Court's conclusion would also be the same even if Plaintiffs chose to forgo a damages award as part of this lawsuit. This is because the amount of infringement that StreamCast could induce in the future is so staggering that the recoverable statutory damages would very probably be well beyond StreamCast's anticipated resources. Because it is extremely unlikely that StreamCast will be able to compensate Plaintiffs monetarily for the infringements it has induced in the past, or the infringements it could induce in the future through Morpheus, Plaintiffs have and will continue to suffer irreparable harm.

Second, the Court agrees with Plaintiffs' claim that a substantial number of their copyrighted works have and would continue to become irreparably exposed to infringement on a tremendous scale due to StreamCast's inducement. This inducement greatly erodes Plaintiffs' ability to enforce their exclusive rights. *See A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1029 (9th Cir.2001) (rejecting Napster's request for compulsory royalties as opposed to injunctive relief because "Plaintiffs would lose the power to control their intellectual property"). It also promises no realistic mechanism through which statutory damages can be collected for all of

the inevitable subsequent infringements occurring outside of the Morpheus System and Software.

In our constitutional system, Congress has been empowered "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to this authority, the Copyright Act confers certain exclusive rights to Plaintiffs in their works, such as the rights of reproduction and distribution. 17 U.S.C. §§ 106(1), (3). The exclusive right to engage in such actions also provides the copyright owner the concurrent power, through the legal system, to exclude others from engaging in such activities without authorization. *See Taylor*, 403 F.3d at 968 (copyright owner has right to "control the use of its copyrighted materials").

Importantly, the inducement of infringement via the internet and other digital pathways represents no ordinary infringement:

> When digital works are distributed via the internet, . . . every downloader who receives one of the copyrighted works . . . is in turn capable of also transmitting perfect copies of the works. Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright.

*Elektra*, 2004 WL 783123, at *7 n. 5 (internal citation omitted); *see also Streeter*, 438 F.Supp.2d at 1073 n. 2 (same). StreamCast's inducement through the Morpheus Software has "left Plaintiffs' sound recordings vulnerable to massive, repeated, near-instantaneous, and worldwide infringement." *Elektra*, 2004 WL 783123, at *7; *Streeter*, 438 F.Supp.2d at 1073 (same); *see also A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 901–02 (N.D.Cal. 2000), *aff'd in part, rev'd in part*, 239 F.3d 1004 (9th Cir.2001) (noting that "the Napster service gives its users the unprecedented ability" to infringe).

When StreamCast induces infringement, Morpheus end-users obtain "perfect copies" of Plaintiffs' work that can be inexpensively reproduced and distributed *ad nauseam.* In fact, through StreamCast's inducement, an entire universe of copyrighted content has been, and can continue to be, made available for unending infringement outside of the Morpheus System and Software. And given the volume of infringement caused by StreamCast's inducement in this particular case, the assault on Plaintiffs' intellectual property rights through further digital transfers by members of the public—Plaintiffs' customer base—is difficult to overstate. StreamCast's inducement has eviscerated Plaintiffs' ability to protect and enforce their statutorily-created property rights.

StreamCast has submitted to this Court an article in which it is claimed that internet file sharing has had a "statistically indistinguishable" effect on music sales. (Baker Decl. Ex. B at 68.) However, this argument misses the mark because it does not matter whether file sharing affects record company sales or not. It would also make no difference if StreamCast's inducement was demonstrated to *increase* Plaintiffs' sales. The Court is not concerned with whether end-users are now less likely, or more likely, to buy Plaintiffs's music or movies as a result of their infringement. This is a policy rationale for a legislature to consider, if it should choose to do so.

As copyright owners, Plaintiffs have the exclusive right to decide when and how their material should be reproduced and/or distributed, regardless of whether their decisions make good business sense. When StreamCast induces infringement, Plaintiffs' copyrighted works can be un-

stoppably and near-instantaneously infringed throughout the computer-literate world with the files obtained by Morpheus endusers. Plaintiffs' power to control their rights has been so compromised by the means through which StreamCast encouraged end-users to infringe (digital files plus the internet) that the inducement amounts to irreparable harm. This is especially true considering the amount of infringement that occurs on the Morpheus System and Software. Morpheus users have the continued ability to pillage a tremendous quantity of Plaintiffs' intellectual property, and to spread this capacity elsewhere with additional file sharing.

The Court is aware that Plaintiffs can seek an award of statutory damages from StreamCast for infringements occurring through the Morpheus System and Software (ignoring for now the likely reality regarding StreamCast's ability to pay). However, Plaintiffs cannot recover damages from StreamCast for the inevitable derivative infringements that will occur outside of Morpheus, with copyrighted content originally acquired within it, as a consequence StreamCast's inducement. Even numerous lawsuits against direct infringers will necessarily prove to be insufficient under these conditions. *Cf. Grokster*, 545 U.S. at 929–30, 125 S.Ct. 2764 ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers....").[20] Indeed, the very need to file multiple lawsuits as a consequence of StreamCast's inducement is itself supportive of an irreparable harm finding.

In sum, Plaintiffs' have offered two independently sufficient grounds for a finding of irreparable harm. Plaintiffs will suffer irreparable harm because of StreamCast's likely inability to pay for the past and/or future infringements that it has induced. Additionally, StreamCast's inducement has and will continue to irreparably harm Plaintiffs' very ability to enforce its exclusive rights. Relatedly, Plaintiffs cannot possibly recover all damages for the infringements that will occur in the future outside of Morpheus, with files obtained within Morpheus, as a consequence of the inducement.

### 2. Adequate Remedy at Law

■ The Court must now consider whether there is an adequate remedy at law for the harm that has or could be caused by StreamCast's inducement. "[T]he requisite analysis for the second factor of the four-factor test inevitably overlaps with that of the first...." *MercExchange*, 500 F.Supp.2d at 582; *see also 800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F.Supp.2d 1327, 1336–37 (M.D.Fla.2007) (quoting *Lewis v. S.S. Baune*, 534 F.2d 1115, 1124 (5th Cir.1976) (" '[o]ften times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable' in the context of a permanent injunction.")). As should be expected, this Court's adequate remedy at law analysis parallels that performed for irreparable harm.

First, as discussed above, there is a substantial possibility that StreamCast will be unable to pay a statutory damages award for the infringement it has induced (or will continue to induce). "Damages are no remedy at all if they cannot be collected, and most courts sensibly conclude that a damage judgment against an insolvent

---

**20.** Through this statement, the Supreme Court evidenced its agreement with Plaintiffs' position that "digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works." *Id.* at 928–29, 125 S.Ct. 2764.

defendant is an inadequate remedy." Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L.Rev. 687, 716 (1990). For this reason, Plaintiffs lack an adequate remedy at law.

■ Second, "[a] legal remedy is inadequate if it would require a 'multiplicity of suits.' " *Id.* at 714. In this case, Plaintiffs will only be entitled to a statutory recovery of those infringements induced through the Morpheus System. However, this award will not compensate Plaintiffs when these same files are subsequently shared outside Morpheus. *Cf. Blake*, 2007 WL 1853956, at *3 ("The remedy available at law for this injury, monetary damages, will only compensate for Defendant's one-time infringement of each recording, and not for inevitable future transfers."). And it would simply be untenable for Plaintiffs to track and proceed against every infringer who continues to illegally reproduce and distribute elsewhere the files originally obtained through StreamCast's inducement. *See Disney Enterprises, Inc. v. Delane*, 446 F.Supp.2d 402, 408 (D.Md.2006) ("[T]here is no way to know how many times this content has been accessed and downloaded.... [B]ecause of the nature of his Web site and trackers, further infringements are a continuing threat, making remedies at law insufficient to compensate for Plaintiffs' injuries."). The only realistic method for remedying such future harm resulting from StreamCast's inducement is by way of a permanent injunction.

Therefore, the second equitable factor weighs in Plaintiffs' favor.

### 3. Balance of Hardships

■ As to the third factor, the Court must consider the hardships;; that might afflict the parties by the grant or denial of Plaintiffs' motion for a permanent injunction. The Court has already described in detail the substantial costs exacted by StreamCast's inducement, whether in the past or in the future, and need not recapi-

tulate them here in detail. Obviously, "the fact that Plaintiffs' recordings can be replicated into infinity, for free, establishes that a distinct hardship rests with Plaintiffs." *Blake*, 2007 WL 1853956, at *3.

StreamCast has its own claims of hardship. First, StreamCast complains that it will suffer undue harm because Plaintiffs' proposed injunction would "wipe [ ] out" the non-infringing aspects of the Morpheus System and Software. (StreamCast Opp. at 15.) Essentially, StreamCast is concerned that Plaintiffs' proposed injunction would be technologically impossible to comply with and would result in the shutdown of the company. However, as discussed *infra* Part III.D.5, the injunction imagined by this Court alleviates such concerns.

In relation to this argument, StreamCast cites to *Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir.1988), where the Ninth Circuit denied an injunction as to further showings of the Alfred Hitchcock film "Rear Window." The Court held that "[i]t would cause a great injustice for the owners of the film" because the "success of the movie resulted in large part from factors completely unrelated to the underlying story." *Id.* at 1479. No such special circumstances are present in this case. StreamCast's inducement of infringement has no separate legitimate business purpose whatsoever. The injunction will be limited to restraining future infringement resulting from StreamCast's inducement, rendering *Abend* inapplicable.

Second, StreamCast argues that it no longer has the intent to induce infringement through its distribution of Morpheus, and that there is no risk that such intent will return:

"There is no evidence of current or potential future inducement: by StreamCast. StreamCast lacks the requisite specific intent to induce infringement,

evidenced by its efforts to discourage infringement, including its development of an effective filter, its messages to users to upgrade to a filtered version, and its testing and license negotiations with ... companies that distribute and license acoustic finger-printing technology/filters."

(StreamCast Opp. at 8.). StreamCast concludes that its "many changes in ... technology, business models, and overall conduct" weigh strongly against issuance of a permanent injunction. (*Id.* at 16.)

StreamCast's self-serving statements, and its actions taken post-September 27, 2006, do not change this Court's conclusion. As discussed *infra* Part III.D.5, distribution can itself amount to an act of inducement.[21] StreamCast unquestionably desires to continue its distribution of Morpheus. However, StreamCast now asserts that its "intent" has changed and that its further distribution would not be based on a will to induce. The Court is inherently suspicious of StreamCast's statements, as it is entirely too easy for an adjudicated infringer to claim a reformation once the specter of a permanent injunction looms near. *Cf. LGS Architects,* 434 F.3d at 1154 (rejecting the argument that "any defendant could moot a preliminary injunction appeal by simply representing to the court that it will cease its wrongdoing"). "[C]ourts must be particularly skeptical about attaching any significance to contrition under protest." *SEC v. Koracorp Industries, Inc.,* 575 F.2d 692, 698 (9th Cir. 1978); *cf. United States v. Parke, Davis & Co.,* 362 U.S. 29, 48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) ("A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by

lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.").

The Court is persuaded that StreamCast would likely engage in further inducement of infringement in the absence of a permanent injunction. As has been stated by the Ninth Circuit in the securities context, "[t]he existence of past violations may give rise to an inference that there will be future violations." *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980).[22] And in this case, such an inference is warranted based upon various undisputed facts, including: (1) "overwhelming" evidence of Stream-Cast's illegal objective, which resulted in a "staggering" amount of infringement, Grokster, 454 F.Supp.2d at 985, 992; (2) StreamCast's business model has depended on inducement, *id.* at 988–89, and the company would financially benefit from further infringement based on its continued desire to advertise, (*See* StreamCast Supp. Opp. at 25); (3) StreamCast's recent efforts to filter admittedly did not commence until after this Court's September 27, 2006 Order granting Plaintiffs' motion for summary judgment, (*See* Weiss Decl. ¶ 4.); and (4) StreamCast has hinted that it may stop filtering its software unless otherwise ordered by this Court. (StreamCast Supp. Opp. at 18 n. 2.)

Even if this Court gave some credence to StreamCast's alleged reform, it could immediately return to its prior ways after the motion for a permanent injunction is denied. *See LGS Architects,* 434 F.3d at 1153. In a relatively recent case decided by the Seventh Circuit, the defendant was a direct infringer who appealed the district court's grant of a permanent injunction.

---

**21.** And as also explained in Part III.D.5, StreamCast is still inducing infringements based on its past acts.

**22.** *Murphy's* invocation does not involve the application of a forbidden *eBay* presumption because this Court's inference is drawn from the evidence that has been submitted throughout this case.

*See generally BMG Music v. Gonzalez,* 430 F.3d 888 (7th Cir.2005). The Seventh Circuit rejected the defendant's argument with the following analysis:

As for the injunction: [Defendant] contends that this should be vacated because she has learned her lesson, has dropped her broadband access to the Internet, and is unlikely to download copyrighted material again. A private party's discontinuation of unlawful conduct does not make the dispute moot, however. An injunction remains appropriate to ensure that the misconduct does not recur as soon as the case ends.

*Id.* at 893; *see also Smith & Nephew, Inc.,* 466 F.Supp.2d at 984 ("Even if Synthes were to terminate its sales of the infringing products voluntarily, it would be free to return to its offending conduct, thereby further imposing monetary and intangible losses on Smith & Nephew."). "Indeed, the entire purpose of an injunction is to take away defendant's discretion not to obey the law." *Canadian Lumber Trade Alliance v. United States,* 441 F.Supp.2d 1259, 1266 (CIT 2006).

Because StreamCast is likely to induce further infringements without an injunction, the balance of hardships necessarily shifts further in Plaintiffs' favor. The Court therefore holds that the third equitable factor strongly supports a permanent injunction.

### 4. The Public Interest

 The Court finally agrees that the public interest will be served with a permanent injunction, since it will protect Plaintiffs' copyrights against increased infringement. *See Perfect 10 v. Google, Inc.,* 416 F.Supp.2d 828, 859 (C.D.Cal.2006), *overruled on other grounds, Perfect 10 v. Amazon.com, Inc.,* 487 F.3d 701 (9th Cir. 2007) ("[T]he public interest is also served when the rights of copyright holders are protected against acts likely constituting infringement."). The public interest in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works. *See Delane,* 446 F.Supp.2d at 408 ("[T]he public interest would not be disserved by a permanent injunction, as there is greater public benefit in securing the integrity of Plaintiffs' copyrights than in allowing Delane to make Plaintiffs' copyrighted material available to the public."); *Blake,* 2007 WL 1853956, at *3 ("[N]o public interest will be disserved by enjoining Defendant from continuing this activity."). Certainly, the public does not benefit from StreamCast's inducement of infringement.

StreamCast claims the public will be harmed because Plaintiffs' proposed permanent injunction is so broad that: (1) StreamCast will be forced to discontinue the Morpheus System and Software (including all non-infringing aspects); and (2) StreamCast will not be able to update the non-filtering legacy versions of its software, which are still apparently used by a large number of end-users. However, as discussed *infra,* the injunction in this case will not require StreamCast to immediately shut down. StreamCast will be empowered to update legacy versions of its software as far as it is technologically feasible to do so.

Thus, the Court finds that the four-factor test favors the imposition of an injunction to restrain StreamCast's inducement of infringement. In its discretion, the Court deems it appropriate for a permanent injunction to issue.

### C. StreamCast's Other Defenses

StreamCast offers several defenses in an effort to argue that Plaintiffs are not entitled to an injunction in any form. None of these defenses are meritorious.

### 1. Unclean Hands

 StreamCast asserts that Plaintiffs are not entitled to a permanent injunction

as a result of their unclean hands. "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." *Survivor Productions LLC v. Fox Broadcasting Co.*, 2001 WL 35829270, at *3 (C.D.Cal. June 12, 2001); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987) ("[T]he defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.").

██ StreamCast claims that Plaintiffs have acted inequitably by refusing to share the hash values or artist-title pairs of their copyrighted material. Plaintiffs' conduct was not inequitable. Plaintiffs have taken the legal position, since this Court's summary judgment holding in their favor, that StreamCast has the burden of effectively stopping infringement via Morpheus and that Plaintiffs are not required to assist in this process. This is not "hav[ing] it both ways" (StreamCast Opp. at 19), let alone an act of contributing to or condoning the inducement of infringement. As explained *infra* Part III.D.6, the Court ultimately agrees with StreamCast that some form of notice from Plaintiffs is required. In particular, Plaintiffs will be required to provide StreamCast with artist-title pairs before StreamCast's filtering responsibilities will be triggered for each copyrighted work. Nonetheless, the law on this question is not fully clear, meaning that Plaintiffs' legal position was objectively reasonable. As this Court similarly stated in its September 27, 2006 Order, "the Court rejects StreamCast's position that a copyright holder's assertion of what it plausibly believes to be its rights under an ambiguous statute" can amount to an inequitable act. *See Grokster*, 454 F.Supp.2d at 998. The refusal to disclose artist-title pairs to

date does not allow StreamCast to succeed on an unclean hands defense.

StreamCast's reliance on *In re Circuit Breaker Litigation*, 860 F.Supp. 1453 (C.D.Cal.1994), is misplaced. In *Circuit Breaker*, a Lanham Act case, defendants were held liable for reconditioning and re-selling circuit breakers made by Westinghouse without having labeling them as "reconditioned." The district court noted that: (1) Westinghouse knew or should have known for years of this practice; (2) the defendants offered to change their labeling practices as soon as an objection was lodged; and (3) the defendants' labeling practices were corrected by the time a permanent injunction was sought. *Id.* at 1454. However, Westinghouse did not simply fail to object to the defendants' practices, but also *itself* resold some of defendants' products without altering the label. *Id.; see also In re Circuit Breaker Litig.*, 852 F.Supp. 883, 886 (C.D.Cal.1994) ("[D]efendants demonstrated that after purchasing reconditioned breakers from defendants, Westinghouse itself re-sold them directly without relabelling them as reconditioned."). It was Westinghouse's involvement in the selling of improperly labeled circuit breakers that undoubtedly was central to the jury's verdict. In stark contrast, not only have the Plaintiffs in this case attempted to change StreamCast's behavior for years through the instant lawsuit, they have not in any way aided StreamCast's inducement. Plaintiffs have simply refused to help StreamCast to comply with the law after summary judgment was granted in their favor.

The Court also fails to understand how StreamCast has suffered any actual harm. StreamCast has only generally argued that due to Plaintiffs' "refusal to share either hash values or Artist–Title information, StreamCast gathered the facts of Artist–Title pair names, even though this process

was time-consuming and difficult to track." (StreamCast Opp. at 19.) StreamCast vaguely claims with some uncertainty that this refusal may cause StreamCast's filter to be "more burdensome ... to update." (*Id.*) The fact that a task was possibly made harder by Plaintiffs' refusal to offer assistance does not mean that StreamCast suffered any form of discernible damages. StreamCast's speculative claims of personal injury are totally insufficient. Furthermore, StreamCast has likely benefitted from Plaintiffs' unwillingness to cooperate. *See Broderbund Software, Inc. v. Unison World, Inc.,* 648 F.Supp. 1127, 1138 (N.D.Cal.1986) ("Far from being injured by the alleged infringement of Letraset's copyright, defendant may have profited from it."). If direct infringement has been easier to commit to date without an effective filter, StreamCast has undoubtedly profited in the form of increased advertising revenue. After all, this Court has previously held that StreamCast's business model depended upon massive infringement.

Given its inability to allege a plausible harm to its own interest, StreamCast argues that the public will be harmed if it is forced to shut down. First, StreamCast's argument was made in light of Plaintiffs' proposed injunction that would require the company to stop its operations unless direct infringement could be prevented exhaustively. From this premise, StreamCast complained that it would lose the opportunity to update all legacy versions of the Morpheus software, which lack a filtering mechanism at this time. But StreamCast will not have to close its doors for failing to introduce a perfect filter at this time. Additionally, the unclean hands "defense will not apply if the defendant merely establishes harm to the public interest." *McCormick v. Cohn,* 1992 WL 687291, at *4 (S.D.Cal. July 31, 1992); *see also Broderbund,* 648 F.Supp. at 1138 (N.D.Cal.1986) ("[A] defense of unclean

hands may be asserted in a copyright infringement action only where the defendant can show that he has personally been injured by the plaintiff's conduct.") (citing *Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979)).

StreamCast's unclean hands defense fails because Plaintiffs have not acted inequitably and StreamCast has suffered no personal harm to date.

### 2. Waiver and Estoppel

StreamCast raises the defenses of waiver and estoppel. "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entm't, Inc.,* 843 F.2d 394, 399 (9th Cir.1988). "In copyright, waiver or abandonment of copyright 'occurs only if the there is an intent by the copyright proprietor to surrender rights in his work.' " *Napster,* 239 F.3d at 1026 (quoting 4 Nimmer & Nimmer, *supra.* ¶ 13.06). StreamCast argues that Plaintiffs waived their right to a permanent injunction by: (1) refusing to provide hash values and artist-title pairs to StreamCast, and (2) allowing other peer-to-peer networks such as iMesh to offer unfiltered software. This argument is wrongheaded. First, Plaintiffs' failure to divulge the requested information to StreamCast provides no evidence whatsoever of an "intent" to waive a permanent injunction. This lawsuit has been litigated for numerous years, and the Court even noted in its 2003 Order granting defendants' motion for summary judgment that "Plaintiffs principally seek prospective injunctive relief." *Metro-Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 259 F.Supp.2d 1029, 1033 (C.D.Cal. 2003). Plaintiffs' refusal to assist StreamCast in their filtering efforts, after years of protracted litigation, cannot plausibly be viewed as a waiver.

Furthermore, Plaintiffs' actions with respect to other companies operating peer-to-peer networks are irrelevant. The Court knows of no rule in copyright, and StreamCast has cited no authority for the proposition, that a copyright holder is bound to pursue either all infringers or none at all. The waiver analysis should ordinarily be limited to evaluating the conduct and/or communications that occur between a plaintiff and a defendant claiming the waiver defense. StreamCast's position would create a rule whereby Plaintiffs would be barred from suing any of the millions upon millions of direct infringers utilizing peer-to-peer networks unless all were sued. Even assuming that Stream-Cast correctly describes Plaintiffs' arrangement with other file sharing companies, it is of no moment.

■■■ StreamCast further raises the estoppel argument, based again upon the same two grounds discussed immediately above: (1) Plaintiffs' refusal to assist StreamCast, and (2) Plaintiffs' dealings with iMesh and others. The elements of estoppel in copyright cases were established by the Ninth Circuit in *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir.1960):

> Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Id.* at 105. StreamCast has failed to even identify this test, let alone demonstrate that it has evidence supporting each factor. While Plaintiffs are undisputedly aware of StreamCast's infringing conduct, the remaining elements find no support in the record. There is no evidence suggesting that Plaintiffs intended or acted in a manner that would allow StreamCast to believe that it could induce infringement.[23] The Court is also unaware of any "true facts" of which StreamCast was ignorant, or how StreamCast was injured through detrimental reliance on Plaintiffs' conduct. Thus, the estoppel argument is rejected.

### 3. Implied License

■■■ StreamCast finally argues that it has been granted an implied license to distribute Plaintiffs' copyrighted materials. The general doctrine behind the theory of implied licenses was detailed recently in *Field v. Google Inc.*, 412 F.Supp.2d 1106 (D.Nev.2006):

> A license is a defense to a claim of copyright infringement. A copyright owner may grant a nonexclusive license expressly or impliedly through conduct. An implied license can be found where the copyright holder engages in conduct from which [the] other [party] may properly infer that the owner consents to his use. Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it.

*Id.* at 1115–16 (internal citations and quotation marks omitted). Similar to its failed waiver argument, StreamCast argues that

---

23. StreamCast's only apparent estoppel argument is based on Nimmer's statement that estoppel can result from Plaintiff's "silence and inaction." 4 Nimmer & Nimmer, *supra*, § 13.07. However, Nimmer followed this point immediately by writing that "[i]t would seem, however, that such passive holding out can rarely be established in statutory infringement actions." *Id.* Additionally, StreamCast could not have reasonably interpreted Plaintiffs' refusal to provide hash values and artist-title pairs, or the alleged actions related to iMesh, as a basis for inferring Plaintiffs' intent to permit inducement.

Plaintiffs' alleged decision to allow *other* peer-to-peer networks to distribute its copyrights gives StreamCast the right to do so as well. This Court cannot agree that Plaintiffs' decision (assuming it is true) to allow other networks to distribute their copyrighted works permits Stream-Cast, along with the rest of the world, to do so as well. There is simply no evidentiary basis that would allow the Court to reach this conclusion.

Finally, though not seemingly acknowledged by the district court in *Field,* the Ninth Circuit has explained that the implied license doctrine in copyright cases is to be very narrowly construed. In *Napster,* the Ninth Circuit stated that "[c]ourts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.' " 239 F.3d at 1026 (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 25 (2d Cir.2000)). Obviously, Plaintiffs did not create their copyrighted works at StreamCast's request or for StreamCast's benefit. StreamCast therefore does not have an implied license to infringe, or to induce the infringement of, Plaintiffs' exclusive rights.

### D. The Permanent Injunction's Scope and Specificity

 A permanent injunction must be carefully crafted. "[T]he scope of the injunction should be coterminous with the infringement." 4 Nimmer & Nimmer, *supra,* § 14.06[C]. This is perhaps partly why "blanket injunctions to obey the law are disfavored." *Mulcahy v. Cheetah Learning LLC,* 386 F.3d 849, 852 n. 1 (8th Cir.2004). Rule 65(d) also requires that injunctions be specific:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.

Fed.R.Civ.P. 65(d). "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir. 1994). The devil is in the details.

### 1. Non–Inducement Theories of Liability

Plaintiffs' proposed permanent injunction would prohibit StreamCast from engaging in certain infringing activities that are far beyond the bounds of this lawsuit. In this case, StreamCast has been held liable for the inducement of infringement only. However, § 1(a)(i) of the proposed permanent injunction appears to be entirely devoted to StreamCast's direct infringement of Plaintiffs' copyrighted works.

From a broad perspective, the *eBay* Court informed district courts that they must meaningfully engage their discretionary function when examining a request for a permanent injunction. The equitable decision whether to grant a permanent injunction cannot be short circuited with automatic issuances or rebuttable presumptions. Similarly, a district court should only include injunctive terms that have a common sense relationship to the needs of the specific case, and the conduct for which a defendant has been held liable. In this vein, the following words from the Supreme Court are instructive:

A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past. But the mere fact that a court *has found that* a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute

and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated from those which a defendant has committed. *NLRB v. Express Pub. Co.,* 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930.–36 (1941).

This basic rule of thumb was utilized in a Seventh Circuit decision authored by Judge Posner. *See Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624 (7th Cir. 2003). In *Substance,* a Chicago public school teacher was sued and held liable for distributing and publishing certain "secure tests" in which the public school system held copyrights. This determination was upheld in the face of several defenses, including fair use. *See generally id.* Although the defendants "[r]emarkably" failed to question the injunction's "scope or application," Judge Posner explained that courts have an "independent duty" regardless to ensure that injunctions meet Rule 65(d). *Id.* at 631–32. The injunction enjoined the defendants from "copying distribution of copies, making derivative copies, displaying copies an[d] performing copies of the Board's examinations...." *Id.* at 632. Among other refinements to the injunction, Judge Posner held that the defendants could only be enjoined from "copying or publishing or otherwise distributing copies of secure Chicago public school tests" because "[n]o evidentiary basis has been laid for a broader injunction." *Id.* Thus, Judge Posner excised the "display" and "performance" language from the injunction because they were irrelevant to the lawsuit.

■ Plaintiffs offer no persuasive reasons why StreamCast should be subject to an injunction that extends beyond inducement. Plaintiffs only argue that they are either entitled to an injunction of this scope, or that it is somehow necessary "to ensure [the] effectiveness" of the permanent injunction itself. (Plaintiffs' Reply at 10.) As to the entitlement argument, Plaintiffs cite to two copyright cases in which an injunction broadly issued prohibiting any infringement whatsoever under the Copyright Act. *See Rohauer v. Friedman,* 306 F.2d 933, 934 (9th Cir.1962); *Sega Enters. Ltd. v. MAPHIA,* 1997 WL 337558, at *1 (N.D.Cal. June 9, 1997). However, *Rohauer* did not address the injunction's scope, and *Sega* provides no explanation for why such a broadly worded injunction was issued. Plaintiffs' alternative argument that a prohibition against direct infringement is necessary to ensure the injunction's effectiveness is also without any evidentiary or legal support. For example, there is no reason to believe that StreamCast's business model in the future would be dependent upon direct infringement as opposed to inducement.

Additionally, § 1(a)(ii) of Plaintiffs' proposed permanent injunction, which centers on secondary liability issues, requires revision. As currently drafted, StreamCast would be permanently enjoined from "directly or indirectly enabling, facilitating, permitting, assisting, soliciting, encouraging, authorizing, inducing, or knowingly materially contributing to" another's infringement through the Morpheus System and Software or some other similar system. This language is unacceptable. Some of the words utilized indicate that the injunction would include acts that are apparently irrelevant to an inducement analysis. For example, "knowingly materially contributing" applies to a test for contributory infringement for which StreamCast was never held liable. Under the rubric recently described by the Ninth Circuit, material contribution and inducement are the two doctrinal subsets of the contributory infringement theory of liability.' *See Perfect 10 v. Visa Int'l Serv.*

*Ass'n,* 494 F.3d 788 (9th Cir.2007). Because inducement is distinct from material contribution, there is simply no reason for such language in the injunction.

The words "enabling" and "permitting" are also potentially troublesome because they suggest that StreamCast might implement technology not capable of substantial noninfringing uses under *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), or that StreamCast could be held liable under a vicarious infringement theory for its distribution of Morpheus. Given the Court's 2003 Order, the Ninth Circuit's affirmance, and the Supreme Court's limited rationale for reversal, there is no reason to issue an injunction that would cover such areas (assuming this was Plaintiffs' intent). *See generally Metro–Goldwyn–Mayer Studios, Inc. v. Grokster Ltd.,* 380 F.3d 1154 (9th Cir.2004); *Grokster,* 545 U.S. at 934, 125 S.Ct. 2764 (leaving "further consideration of the *Sony* rule for a day when that may be required"); *see also id.* at 930 n. 9, 125 S.Ct. 2764 ("Because we resolve the case based on an inducement theory, there is no

need to analyze separately MGM's vicarious liability theory.").[24] Due to the procedural posture of this case, and the rulings that have been issued, the injunction should not include acts (or descriptive words) that do not pertain to the inducement analysis.

For these reasons, inducement is the only form of liability that is relevant to the permanent injunction. Under the circumstances of this case, it would be inappropriate to issue an injunction in which StreamCast would be barred from violating the Copyright Act in any other manner. *See Express Pub. Co.,* 312 U.S. at 435–36, 61 S.Ct. 693.

### 2. *Non–Federal Law*

Plaintiffs' proposed permanent injunction would apply not only to copyrighted works in which any Plaintiff "owns or controls an exclusive right under" the Copyright Act, but also to exclusive rights granted by "state or common law." Through this provision, Plaintiffs ask not only that StreamCast be enjoined from violating the Copyright Act, but any copyright law in existence nationwide. This

---

**24.** Moreover, § 1(a)(ii) is vague and unclear as written. Plaintiffs simply rattle off a list of buzzwords ("enabling," "assisting," "soliciting," etc.). It must be remembered that third parties may one day be bound by the terms of this injunction. "The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure,* § 2955. The mere fact that the Court used certain of these terms in its September 27, 2006 Order does not necessarily mean that each has a separate legal sphere of existence in the inducement calculus. Some of the listed terms appear to encapsulate or overlap with others, or at least could be construed in such a manner. Adding to the problem is the fact that Plaintiffs have included the word "inducing" within this list of prohibitions. This choice creates chaos because terms such as "encouraging"

and "soliciting" are presumably actions fitting within the overall "inducement" doctrine.

When Plaintiffs (and StreamCast) resubmit a proposed permanent injunction to the Court, they should: (1) begin by broadly prohibiting StreamCast from inducing the infringement of Plaintiffs' copyrighted works, which is then (2) followed by a subset of sufficiently specific actions that qualify as relevant to a finding of inducement, and (3) include the specific filtering regimen ultimately adopted by this Court. The remainder of § 1(a)(ii) should also be reexamined. Unnecessary verbiage is to be avoided, but terms should be defined such that the various subsets of inducing acts can be readily recognized. The parties should focus on specific actions that were relevant to this Court's summary judgment analysis, as well as others that would likely be relevant to an inducement analysis in the future.

request is overly broad. The "state or common law" clause must be struck, based again on the principle enunciated in *Express Publishing*. For this reason, "[t]he injunction may not include sound recordings for which plaintiffs do not own or control federal copyrights." *BMG Music v. Pena*, 2007 WL 2089367, at *5 n. 2 (E.D.N.Y. July 19, 2007).

### 3. Valid and Subsisting Copyrights

The Court also favors Judge Posner's language in *Substance*, where the Seventh Circuit limited the injunction's application to those secure tests in which the school board had a "valid and subsisting copyright." 354 F.3d at 632. While Plaintiffs' "owns or controls an exclusive right under Section 106" clause may necessarily include an implied limitation of this nature, the "valid and subsisting copyright" clause adds specificity. The injunction should clearly articulate that it only enjoins the inducement of copyrights, covered by Section 106 of the Copyright Act, in which the Plaintiffs own or control rights, and that were ultimately infringed by end-users during the time in which the copyright was valid and subsisting. Subsequently submitted proposed permanent injunctions by either party should encompass this limitation.

### 4. Plaintiffs' Universe of Copyrights

Plaintiffs' proposed injunction also extends to all of Plaintiffs' copyrighted works "whether now in existence or later created." This provision is entirely proper, as confirmed by recent Ninth Circuit law. *See Amazon.com, Inc.*, 487 F.3d at 710 n. 1 ("Once a court has jurisdiction over an action for copyright infringement under section 411, the court may grant injunctive relief to restrain infringement of any copyright, whether registered or unregis-

tered."). The clause also comports with the Copyright Act's express terms. *See* 17 U.S.C. § 408 ("[R]egistration is not a condition of copyright protection."). Because the permanent injunction may extend to "any copyright," this includes: (1) all valid and subsisting copyrights in existence at the time the injunction is issued (not simply those a defendant has been held liable for infringement), and (2) any valid and subsisting copyright not yet created. *See Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir.1994) ("The power to grant injunctive relief is not limited to registered copyrights, or even to those copyrights which give rise to an infringement action .... Injunctions have even prohibited infringement of works not yet in existence."); *Pac. & Southern Co., Inc. v. Duncan*, 744 F.2d 1490, 1499 n. 17 (11th Cir.1984) (holding that district court had power to enjoin the infringement of future works not yet created by the injunction's proponent).[25] In light of the facts of this case, and that future, popular works created by Plaintiffs would undoubtedly financially benefit StreamCast's inducement of infringement, the clause will be included.

### 5. Filtering and Updating Legacy Software

The purpose of a permanent injunction in this case is to restrain StreamCast's inducement of infringement, as well as future end-user infringements arising from the inducement. As stated by the Supreme Court, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 936–37, 125 S.Ct. 2764.[26] StreamCast fully intends to

---

**25.** *Olan Mills* and *Duncan* were the two cases cited by the Ninth Circuit in support of the above-quoted proposition taken from *Amazon.com, Inc.*, 487 F.3d at 710 n. 1.

**26.** Upon remand, in this Court's September 27, 2006, the Court interpreted the Supreme Court's inducement rule as follows:

continue its distribution of the Morpheus System and. Software. While reserving its right to contest the injunction's issuance in the first place, StreamCast concedes that non-distribution acts promoting and encouraging infringement via Morpheus can be enjoined. (*See* StreamCast Supp. Opp. at 9–10 ("[T]he Court must narrowly tailor any injunction to address only the specific acts of inducement for which StreamCast was found to liable....").)[27]

The fundamental dispute between Plaintiffs and StreamCast is whether this Court has the power to regulate StreamCast's distribution of the Morpheus System and Software to end-users. In particular, Plaintiffs request that StreamCast filter the Morpheus System and Software to reduce its infringing capacities as far as possible.

■ *Background:* The Court is guided generally by the principle that it should only restrain or prohibit actions that violate the law. As stated by the Ninth Circuit:

> [A]lthough federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction over the general subject matter and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct, this power is not often necessary or appropriate, and is therefore infrequently exercised. Courts commonly have exercised this extraordinary power only in antitrust cases, although we see no reason why it would not be available when necessary and appropriate in cases involving other areas of substantive law. Even in the antitrust area, however, a necessary and appropriate injunction against otherwise lawful conduct must be carefully limited in time and scope to avoid an unreasonably punitive or non-remedial effect.

*United States v. Holtzman,* 762 F.2d 720, 726 (9th Cir.1985) (citations omitted). The

---

Plaintiffs need not prove that StreamCast undertook specific actions, beyond product distribution, that caused specific acts of infringement. Instead, Plaintiffs need prove only that StreamCast distributed the product with the intent to encourage infringement. Since there is no dispute that StreamCast did distribute an infringement-enabling technology, the inquiry focuses on the defendant's intent, which can be shown by evidence of the defendant's expression or conduct.

*Grokster,* 454 F.Supp.2d at 985. More recently, in *Amazon.com,* the Ninth Circuit stated briefly in a footnote that "Google's activities do not meet the 'inducement' test explained in Grokster because Google has not promoted the use of its search engine specifically to infringe copyrights." 487 F.3d at 727 n. 11. And in *Visa,* the Ninth Circuit also stated that "[b]ecause Perfect 10 alleges no 'affirmative steps taken to foster infringement' and no facts suggesting that Defendants promoted their payment system as a means to infringe, its claim is premised on a fundamental misreading of *Grokster* ...." 494 F.3d at 800–01.

One could view *Amazon.com* and *Visa* as premising inducement liability upon distribution *plus* some other outward action (at some point) that either promoted or encouraged the infringement via the product in question. To the extent Amazon.com and Visa represent a narrower vision of the rule described by this Court in its September 27, 2006, it would certainly not disturb this Court's summary judgment holding based on StreamCast's undisputed acts of promotion/encouragement of infringement. Importantly, there is still no legal requirement, as StreamCast previously argued, that a copyright owner must show "specific actions, beyond product distribution, that caused specific acts of infringement."

**27.** The injunction need not necessarily be limited to the specific inducing acts for which StreamCast was held liable. Other acts might be included if they would also likely assist StreamCast's inducement through Morpheus's distribution.

Court is not aware of any Copyright Act case in which lawful conduct has been proscribed. And as stated in another district court opinion, "injunctive relief should avoid prohibiting legitimate conduct." *Fonovisa v. Napster, Inc.*, 2002 WL 398676, at *9 (N.D.Cal. Jan 28, 2002).

StreamCast asserts that its continued distribution of the Morpheus System and Software is legal, even though it fails to implement any filtering technology to limit Morpheus's infringing capabilities, as long as it does not engage in any additional actions or statements promoting or encouraging end-user infringement. StreamCast concludes that its mere distribution of a product capable of substantial noninfringing uses, going forward, is legal under *Sony* and cannot be regulated with filtering.

■ The Court recognizes that *in the first instance* one cannot be held liable for contributory infringement under *Sony* merely for distributing a product capable of substantial noninfringing uses, even with knowledge that the product is used to infringe. *See Grokster*, 545 U.S. at 931–32, 125 S.Ct. 2764. Of note, this Court's 2003 Order ruling that Morpheus met the *Sony* standard has never been disturbed. However, *Sony* provides no immunity where a staple's distribution is sufficiently connected to the promotion/encouragement of infringement. *See id.* at 935, 125 S.Ct. 2764.

The Supreme Court's decision in this case did not address the question of remedies. Consequently, analogies must be made with reference to the law of patent inducement and elsewhere. As codified by the Patent Act, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). One leading patent treatise has argued that "the patent owner's remedies under Section 271(b) for active inducement cannot be expanded so as to establish exclusive control over the staple commodity." 5 Donald J. Chisum, *Chisum on Patents*, § 17.04[3]. In patent law, the staple article "is one that was not specifically designed for use with a patented process [or combination] and has substantial, efficient, and feasible uses outside of the patent. If the practice of the patented method [or combination] is incidental and necessary to the practice of the unpatented methods, the device is a staple and there can be no contributory infringement." *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 2005 WL 2346919, at *9 (E.D.Cal. Sept.23, 2005) (quoting 4 Patent Law Fundamentals § 20:7). The "staple commodity" is equivalent to a product in the copyright genre that meets *Sony's* test—it is "capable of substantial noninfringing use." 464 U.S. at 440–42 & n. 20, 104 S.Ct. 774 (citing 35 U.S.C. § 271(c) [28]).

In support of his limiting principle, Chisum quotes a footnote in a Fifth Circuit opinion from 1979, where the Court there noted that under Section 271(b):

> The patentee's relief, however, would not be an injunction forbidding the defendants' [s]ale of staples, since mere sale is not wrongful under either (b) or (c). Appropriate relief might extend to an injunction against continuing to 'actively induce' infringement, conduct forbidden by (b).

*Rohm & Haas Co. v. Dawson Chem. Co.*, 599 F.2d 685, 703 n. 24 (5th Cir.1979).

28. "Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, *and not a staple article or commodity of commerce suitable for substantial noninfringing use,* shall be liable as a contributory infringer." 35 U.S.C. § 271(c) (emphasis added).

This analysis was put into action by the district court in *Mickowski v. Visi–Trak Corp.*, 36 F.Supp.2d 171 (S.D.N.Y.1999), where the defendant had been held liable for inducement under Section 271(b). As part of a request for a permanent injunction, the plaintiff sought "an injunction against further manufacture or sale by defendants of any die casting monitoring system capable of practicing the methods claimed by the patents in suit." *Id.* at 182. The district court rejected this ban on distribution because it "would impermissibly expand the scope of [plaintiff]'s patent monopoly by effectively granting [plaintiff] a monopoly over a product capable of noninfringing uses." *Id. See also Allergan Sales, Inc. v. Pharmacia & Upjohn, Inc.*, 41 U.S.P.Q.2d 1283, 1290 (S.D.Cal.1996) ("[T]he court does not at this time enjoin Pharmacia from selling the Model 920 IOL itself, as Pharmacia has made a showing that this lens can be, and is used in actual practice, in a way that does not infringe upon the method patent of claim 7."). According to StreamCast, this authority demonstrates that an injunction requiring filtering would improperly allow Plaintiffs monopoly power over its staple article the Morpheus System and Software.[29]

■ *Application:* These cases are of limited assistance to StreamCast, however, because they speak specifically of a proposed total ban on the distribution or sale of a staple. Were this Court to hold that StreamCast could no longer distribute Morpheus in light of its inducement, such a ruling might grant rights to Plaintiffs beyond the limited monopoly permitted under the Copyright Act. But a filtering solution is different. There is a distinction between forbidding distribution of a technology capable of substantial noninfringing uses and simply requiring sufficient efforts to minimize the prospective infringement that would otherwise be induced through the staple's distribution. StreamCast would still be allowed to distribute Morpheus so long as it undertook sufficient measures to mitigate end-user capacity for infringement.

StreamCast argues still that Plaintiffs should not be permitted any "right to control the distribution" of products capable of substantial noninfringing use. *See Sony*, 464 U.S. at 441, 104 S.Ct. 774 (citing *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 198, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980)). However, *Sony* does not create a general rule of immunity against all forms of secondary liability, but provides only a limited safe harbor as to "imputed intent." *See Grokster*, 545 U.S. at 934, 125 S.Ct. 2764. Distributors of products capable of substantial noninfringing uses are often vulnerable to lawsuits for contributory infringement, and injunctions regulating how such products may be subsequently distributed (as opposed to a total ban) have been upheld. StreamCast need only look to its predecessor—Napster—for such confirmation.

On its first appeal to the Ninth Circuit, Napster argued that it could not be held liable for material contribution or vicarious infringement based on the fact that its system was capable of substantial noninfringing uses. In affirming the district court's determination that a preliminary injunction was proper, the Court held that *Sony* was not a bar to liability on either

---

**29.** Plaintiffs have cited to two patent cases, which they claim reveal that an injunction can issue to enjoin a product's distribution based on a violation of Section 271(b). *See Smith & Nephew, Inc.*, 466 F.Supp.2d 978; *Nat'l Instruments Corp. v. Mathworks, Inc.*, 2003 WL 24049230, at *5 (E.D.Tex. June 23, 2003). These citations are not helpful because these lawsuits apparently also involved the defendant's direct infringement of a patent. Under the Patent Act, a product capable of infringing use can still be held liable for direct (not merely secondary) infringement. *See* 5 Chisum, *supra*, § 16.02[3][C] & n. 27.

theory. *See Napster,* 239 F.3d at 1020, 1022–23. On remand, the district court ordered Napster to institute "audio fingerprinting" technology (presumably a different term for acoustical fingerprinting) in order to effectuate the terms of the modified preliminary injunction. The Ninth Circuit affirmed this action as a "proper exercise of the district court's supervisory authority." *A & M Records, Inc. v. Napster, Inc.,* 284 F.3d 1091, 1098 (9th Cir. 2002). Importantly, Napster was never enjoined from distributing its software to the public. The injunction was solely aimed at stopping the infringement that was effectuated through Napster, and court-ordered filtering was deemed an appropriate mechanism for achieving this task. While the plaintiffs were not given exclusive control over Napster's product, *Sony* was no obstacle to an injunction designed to reduce the infringing capabilities of a product capable of substantial noninfringing use.

Based on the Ninth Circuit's *Napster* decisions, products capable of substantial noninfringing use can be filtered if the failure to do so would constitute either continued contributory infringement (in the form of material contribution) or vicarious infringement. It would therefore be anomalous if such filtering were always unavailable where a defendant has only been held liable for inducement. Thus, there' should not be an *a priori* rule as to whether or not the continued distribution of a product capable of substantial noninfringing uses, in the absence of any further acts promoting its use for infringement, amounts to inducement. Rather, a court should consider the facts of each case before rendering such a determination.

In this Court's view, StreamCast's argument against filtering reflects an overly restrictive vision of inducement. The Court is mindful of the following critical passage from the Supreme Court's opinion in this case:

> It is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use.

*Grokster,* 545 U.S. at 940 n. 13, 125 S.Ct. 2764. In effect, the "culpable act," which induces third parties to infringement, certainly manifests itself once two components are present—distribution and promotion/encouragement. *See Amazon.com,* 487 F.3d at 727 n. 11; *Visa,* 494 F.3d at 800–01. It is important to recognize that the Supreme Court did not impose any strict timing relationship between specific acts promoting infringements, distribution, and the direct infringements themselves. For a party to be liable for inducement, distribution may begin prior to any promotion of infringement, distribution and promotion can occur at the same time, and most critically, *distribution can follow past promotion.* This highlighted portion of the above sentence is crucial. As a matter of common sense, a successful inducer will sometimes have no need to repeat the infringing message *ad infinitum.* This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate. At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.

Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message. There is no difference between these infringements and those that are consummated while the defendant is still engaging in the active promotion of infringement. Critically, Justice Souter recognized the importance of this relationship between past promotion and future distribution during the Supreme Court's oral argument in this case:

But I don't ... understand how you can separate the past from the present in that fashion. One, I suppose, could say, "Well, I'm going to make inducing remarks Monday through Thursday, and I'm going to stop, Thursday night." The sales of the product on Friday are still going to be sales which are the result of the inducing remarks Monday through Wednesday. And you're asking, in effect—you're asking us—to ignore Monday through Thursday.

*Metro–Goldwyn–Mayer Studios, Inc., v. Grokster, Ltd.*, No. 04–480, Mar. 29, 2005 ("Oral Argument Transcript"), at 30, available at http://www.supremecourtus.gov/oral_arguments/argument_transcripts/04–480.pdf. Thus, distribution of a product capable of substantial noninfringing uses, even after the promotion/encouragement of infringement ceases, can by itself constitute inducement.

StreamCast's future distribution is undoubtedly connected to past promotional efforts. In its September 27, 2006 Order, this Court recounted in detail, among other undisputed facts, StreamCast's efforts to promote its software to the Napster market as a mechanism for infringing Plaintiffs' copyrighted works. *Grokster*, 454 F.Supp.2d at 985–86. These promotional efforts proved to be wildly successful, especially because StreamCast marketed itself to Napster users at a particularly important juncture—while Napster was in imminent legal jeopardy. End-user infringement exponentially increased, evidencing that StreamCast's express and implied messages of promotion were received, absorbed, and responded to by the market. Or as more recently stated by the Ninth Circuit:

The software systems in ... *Grokster* were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music and reducing legitimate sales of such music to that extent. Most ... users understood this and primarily used those systems to purloin copyrighted music. Further, the ... operators explicitly targeted then-current users of the Napster program by sending them ads for its OpenNap program.

*Visa Int'l Serv. Ass'n*, 494 F.3d at 801. StreamCast's revenues skyrocketed as a result. Furthermore, StreamCast could not reasonably claim ignorance of the infringements perpetrated by Morpheus endusers. *Grokster*, 454 F.Supp.2d at 992.

StreamCast has etched its niche in the market for infringement. Under the facts of this case, and the doctrinal point raised by Justice Souter, neither the simple passage of time nor the entry of judgment in this case can remedy StreamCast's past promotion as the "next Napster." The fact that a permanent injunction is imposed also does not leave Morpheus magically reborn as a product safe for unfiltered distribution under *Sony*. As stated by Justice Scalia to StreamCast's counsel at oral argument, "the point is that those past acts [of encouragement] are what have developed your client's current clientele." Oral Argument Transcript at 29.

It is also of no moment that Morpheus's mere distribution, had there never been any promotion of infringement by StreamCast, would have been legal under this

Court's prior interpretations of *Sony*. The *Sony* rule is at its height when analyzed in the vacuum of a product's architecture. But once other evidence is in fact considered (*e.g.*, past promotion), mere distribution of a staple can "itself" become the "culpable act" lacking protection under the Copyright Act. *Grokster*, 545 U.S. at 940 n. 13, 125 S.Ct. 2764. StreamCast is not being "punished" for its past actions; rather, StreamCast's past activity is relevant to what future actions constitute inducement going forward.

An unfiltered Morpheus, which Stream-Cast intends to distribute if provided the opportunity, necessarily capitalizes on and remains inexorably linked to its historical efforts to promote infringement. The bell simply cannot be unrung. Accordingly, Morpheus's connection to the past promotion of infringement means that StreamCast's continued distribution of Morpheus alone constitutes inducement. This Court is empowered to regulate Morpheus under 17 U.S.C. § 502(a) in order to prevent this distribution from causing future harm to Plaintiffs' rights.[30]

*Remedy:* Given the Court's determination regarding the status of Morpheus's further distribution, the Court must analyze the proper scope of injunctive relief. First, because StreamCast's distribution of Morpheus will induce the infringement of Plaintiffs' copyrights, the Court could potentially bar Morpheus's distribution in its entirety. However, as previously discussed, this remedy could constitute an inappropriate extension of Plaintiffs' copyrights. Plaintiffs should not lightly be given total control over a product capable of substantial noninfringing uses.

Second, Plaintiffs' proposed permanent injunction would bar StreamCast from distributing Morpheus or another peer-to-peer network "unless and until it has demonstrated to the Court's satisfaction that it contains a robust and secure means exhaustively to prevent users from using the applicable system . . ." to infringe Plaintiffs' copyrights. As interpreted by the Court, this language would require StreamCast to shut down until it was capable of installing a "perfect" filter that could prevent any infringement from occurring. Yet, the undisputed evidence currently indicates that there is no filtering mechanism that can "exhaustively" stop every single potential infringement on a peer-to-peer network similar to Morpheus. Plaintiffs' declarations, even if accepted, do not claim a 100% success rate with a regimen of filtering that includes acoustical fingerprinting. (*See* Marco Decl. § 17; Ikezoye Decl. ¶ 18.) Additionally, Plaintiffs' own briefing indicates that the highly imperfect keyword filter "may be the only way to prevent unauthorized access to 'leaked' pre-release copies of sound recordings that have yet to be added to the acoustical-fingerprint database." (Plaintiffs' Supp. Brief at 7.) This statement strongly suggests that audio and/or video files containing such leaked works cannot be "exhaustively" filtered by any known method at this time. Based on the current record, a permanent injunction requiring Stream-Cast to institute a perfect filter is not technologically feasible, and would be

---

[30]. Even if StreamCast ceased distributing any software in the future, and chose instead to collect advertising revenue for unfiltered software currently in the market, its past promotion and past distribution could still constitute an inducement of infringements executed by end-users in the future. The fruits of StreamCast's past inducing activity are likely being realized to this day. Therefore, the Court may have still required StreamCast to implement and distribute a filtering mechanism and encourage end-user upgrades, discussed *infra*, to prevent its inducement from being further actualized (as feasible) in the form of end-user infringements.

equivalent to a ban on Morpheus's distribution.[31]

 An injunction in this form will not issue. Plaintiffs' copyrights generally do not afford them the *right to decide whether* a staple should or should not be distributed.[32] Furthermore, this Court also has doubts that an immediate shutdown order would most effectively stop further infringement. In its 2003 Order, the Court discussed the undisputed nature of StreamCast's peer-to-peer network: "If ... [StreamCast] closed [its] doors and deactivated all computers within [its] control, users of their products could continue sharing files with little or no interruption." *Grokster*, 259 F.Supp.2d at 1041. If StreamCast were prohibited from distributing or operating Morpheus, including a version with a filtering mechanism, end-users will continue to infringe. It is likely more beneficial to Plaintiffs' rights if StreamCast were allowed to distribute filtering software and to take steps to encourage end-users into accepting an upgrade.

In any event, the Court will follow a third path. A permanent injunction will issue requiring StreamCast to reduce Morpheus's infringing capabilities, while preserving its core noninfringing functionality,[33] as effectively as possible.[34] StreamCast's duties will include, but not necessarily be limited to: (1) a filter as part of future Morpheus software distributed to the public; and (2) steps to encourage end-user upgrades from non-filtered legacy software. Such duties represent the proper balance between competing interests. Plaintiffs' copyrights can be protected to the extent feasible, but Morpheus's noninfringing uses will not be completely enjoined. *Cf. Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 2006 WL 3813778, at *10 (S.D.Tex. Dec.27, 2006) (issuing permanent injunction in patent case ordering defendant "to implement the structural modifications ... that both parties agree would prevent future infringement" while preserving defendant's ability to "practice the prior art").

31. StreamCast has also complained that a perfect filter is impossible because it cannot force end-users to upgrade from their legacy software. Plaintiffs claim in response that the proposed language regarding the exhaustive prevention of infringement does not apply to legacy software; StreamCast need only use "all technologically feasible means" to prevent infringement on legacy software. (Plaintiffs' Reply at 11.) Because § 1(b)'s scope is ambiguous, the Court does not fault StreamCast's interpretation.

32. While there is no question that filtering can be employed in conjunction with Morpheus, and Plaintiffs strongly assert that this can be done in a manner that effectively protects their rights, future inducement lawsuits may involve products capable of substantial noninfringing uses that are intentionally designed to make filtering impossible. An injunctive remedy for inducement in such a case could be difficult to craft due to conflicting tensions. A copyright owner has not been

granted the exclusive right to distribute a product capable of substantial noninfringing uses, which courts have cited as a concern in the remedies context. Yet, under the Supreme Court's *Grokster* opinion, mere continued distribution represents inducement when sufficiently connected to past promotional efforts. It is not clear whether a complete ban on further distribution, potentially the only effective injunctive remedy, could be allowed in such a case.

33. Some usability/functionality harm to Morpheus may be inevitable, but considering the quantum of inducement that would otherwise be effectuated, such effects would have minimal costs to society in this case.

34. Thus, if it is ultimately possible to filter Plaintiffs' copyrighted works with 100% effectiveness, the Court can consider modifying the injunction to reflect this new development.

In defining "effectiveness," StreamCast would likely argue that cost is relevant to the calculus. The Court is aware that Plaintiffs want StreamCast to apply a "state of the art" commercial filter that includes acoustical fingerprinting, which StreamCast has termed "cost-prohibitive." (Weiss Decl. ¶ 12.) The Court is tentatively of the view that affordability is a minor, but potentially relevant, consideration at the fringes. For example, if two competing filtering regimens had identical success rates for purposes of reducing infringement, but the cost of the first option was inordinate compared to the second, the Court might be more inclined to opt for the latter. Cost is not likely to be a controlling factor, as the injunction will be designed primarily to protect Plaintiffs' copyrights. The mere fact that an adjudicated infringer may have to expend substantial resources to prevent the consummation of further induced infringements is not a central concern. *See Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir.1995) (holding that a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities").

As explained *infra* Part III.F, the Court intends to appoint a special master. The special master will assist this Court in selecting a filtering regimen that reduces Morpheus's infringing capacity, preserves its noninfringing functionality as feasible, and analyzes any potential cost concerns.

### 6. Notice of Copyrighted Works

█ StreamCast also argues, as part of a permanent injunction, that it should have no duty to filter Plaintiffs' copyrighted works until it has been provided sufficient notice. The Court agrees.

In *Napster*, the district court enjoined Napster from "engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted musical compositions and sound recordings...." 114 F.Supp.2d at 927. The district court determined that "[b]ecause defendant has contributed to illegal copying on a scale that is without precedent, it bears the burden of developing a means to comply with the injunction." *Id.*

While the Ninth Circuit affirmed the injunction generally, its scope was too broad. The Ninth Circuit held:

[W]e place the burden on plaintiffs to provide notice to Napster of copyrighted works and files containing such works available on the Napster system before Napster has the duty to disable access to the offending content. Napster, however, also bears the burden of policing the system within the limits of the system.

*Napster*, 239 F.3d at 1027. On remand, the plaintiffs were ordered to provide Napster with certain information regarding their copyrighted works: (1) title; (2) artist; (3) the name(s) of one or more files on Napster's system containing the work; and (4) certification of ownership. *See, e.g., A & M Records, Inc. v. Napster, Inc.*, 2001 WL 227083, at *1 (N.D.Cal. Mar.5, 2001), *aff'd*, 284 F.3d 1091, 1096–97 (2002) "The Ninth Circuit was clearly concerned with the overbreadth of the injunction and believed that any liability based solely on the architecture of Napster's system implicated *Sony.*" *Fonovisa*, 2002 WL 398676, at *9. In this way, Napster would not be "penalized simply because of its peer-to-peer file sharing system." *Id.*

Doctrinally, the notice requirement is of particular interest considering the fact that the district court and Ninth Circuit agreed that Napster would likely be held liable as both a contributory *and* vicarious infringer. The Ninth Circuit's modification is eminently clear when examined solely from a contributory liability perspective, since the Ninth Circuit's affir-

mance on this theory was based substantially on *Napster's* actual notice. 239 F.3d at 1027 ("The mere existence of the Napster system, absent actual notice and Napster's demonstrated failure to remove the offending material, is insufficient to impose contributory liability."). However, Napster was also likely to be found liable at trial as a vicarious infringer, which is based on a defendant's financial benefit and its right and ability to supervise. *See id.,* at 1023–24. *Sony's* knowledge prong is completely irrelevant to whether one can be held liable as a vicarious infringer. *Id.* at 1022 ("*Sony's* 'staple article of commerce' analysis has no application to Napster's potential liability for vicarious copyright infringement."). By imposing the notice requirement on the plaintiffs, the Ninth Circuit essentially allowed *Sony* notice concerns to creep back into the vicarious infringement analysis for purposes of an injunction.

Similarly, *Sony* represents no bar to inducement liability. According to the Supreme Court, "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, *Sony's* staple-article rule will not preclude liability." *Grokster,* 545 U.S. at 935, 125 S.Ct. 2764. And due to its relationship to StreamCast's past promotion of infringement, the mere continued distribution of Morpheus now by itself amounts to inducement. *See supra* Part III.D.5.

Although actual notice of specific infringing files (and the failure to remove them) is not a prerequisite to inducement liability in the first instance, like vicarious infringement, *Napster* informs this Court that notice is relevant to the injunction. While the continued distribution of an ineffectively filtered Morpheus would violate the injunction, some precautions are necessary to ensure that StreamCast will not be unfairly penalized for the architecture of its staple commodity. For example, by requiring Plaintiffs to provide StreamCast with some notice before the latter's filtering responsibilities for a given copyright are triggered, there will be no threat of contempt proceedings simply because StreamCast failed for a time to filter certain files containing recently released (e.g., illegally "leaked" works) or hardly known copyrighted material.

One might argue that *Napster's* notice requirement should not be followed in light of the Supreme Court's Grokster opinion. At one point, the Supreme Court stated that "*Sony* did not displace other theories of secondary liability," and is confined to cases involving "imputed intent." *Grokster,* 545 U.S. at 934, 125 S.Ct. 2764. It could reasonably be argued, as a result, that *Sony* occupies a much less central position in the copyright field than was previously understood. Since Sony cannot preclude vicarious and inducement liability, the doctrine could now be viewed as irrelevant to injunctions aimed at preventing such violations. However, this Court will not read this implication into the Supreme Court's ruling, nor hold that *Napster* has been overruled *sub silentio* on this question. It must be recognized that the Supreme Court did not reach, or even comment on, the proper scope of an injunctive remedy.

On the other hand, while some form of notice is appropriate, the Court will not require Plaintiffs to provide hash values to StreamCast. As in *Napster,* once Plaintiffs have provided certain basic information sufficient to constitute "notice," the burden of implementing an effective filtering solution rests on StreamCast. 239 F.3d at 1027. *Napster* does not require a copyright owner to disclose to an adjudicated infringer all specialized information in his/her possession that might be helpful

to the prevention of further infringement, such as hash values.

Therefore, StreamCast's duty to filter any particular copyrighted work will commence upon Plaintiffs' provision of notice. For each work, Plaintiffs will be required to provide the artist-title pair, a certification of ownership, and some evidence that one or more files containing each work is available on the Morpheus System and Software.[35]

### 7. Advertising to Users of Legacy Software

Plaintiffs argue that "[i]f StreamCast can earn no profits from users of legacy versions of Morpheus that lack filtering technology it will have a powerful reason promptly to move those users to new versions of Morpheus with filtering technology." (Plaintiffs' Supp. Brief at 18.) The Court tentatively agreed at first. But upon further consideration, the Court will not prohibit StreamCast from displaying advertising through Morpheus to users of legacy software. The Court agrees with StreamCast that this restriction will not have any effect on the quantum of induced infringement. At this point in time, the Court has no reason to believe that StreamCast will disregard the terms of a permanent injunction, including those provisions designed to encourage and/or coax end-user upgrades to Morpheus versions containing a filter.

Of course, if StreamCast fails to comply with its responsibilities under the permanent injunction, the Court has the power to respond. Should the Court later determine that StreamCast has violated the terms of the permanent injunction, the Court can consider what remedies should be imposed in order to coerce compliance and compensate Plaintiffs for the harm

caused. See Shuffler v. Heritage Bank, 720 F.2d 1141, 1147 (9th Cir.1983) (citations omitted) ("Sanctions for civil contempt can be imposed for one or both of two distinct purposes: (1) to compel or coerce obedience to a court order; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance."). In order to coerce compliance with the other terms of the permanent injunction, as part of a contempt sanction, this Court could then potentially prohibit StreamCast from collecting advertising revenue on legacy software or even issue a shut down order. But in the meantime, Plaintiffs' requested ban on advertising to legacy software is premature.

### 8. Reservation of Court's Power to Alter Terms

The Court also recognizes that filtering technology is evolving. New products may emerge over time that will be vastly more effective than their predecessors. Consequently, the permanent injunction shall retain a clause that expressly: (1) permits this Court to amend the permanent injunction in light of such new developments; and (2) provides a procedure by which either party may petition the Court for such an adjustment to the permanent injunction's terms. See, e.g., United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."); Mariscal–Sandoval v. Ashcroft, 370 F.3d 851, 859 (9th Cir.2004) ("The proposition that a court has the authority to alter the effect of an injunction in light of changes in the law or the circumstances is well established."); Transgo, Inc. v. Ajac Transmis-

---

**35.** This last requirement may potentially be limited to a list of file "names," as approved in Napster. The Court has not decided on the precise form of evidence at this time. The special master will first make a recommendation regarding the type of information that Plaintiffs can obtain about these files from the Morpheus System and Software.

*sion Parts Corp.*, 768 F.2d 1001, 1030 ("When dealing with its equitable powers, a court possesses the intrinsic power to adapt the injunction to meet the needs of a 'new day.' "); *cf. Napster*, 284 F.3d at 1098 ("A district court has inherent authority to modify a preliminary injunction in consideration of new facts.").

### E. Request for an Evidentiary Hearing and Discovery

 In addition to opposing the motion for a permanent injunction, StreamCast seeks an evidentiary hearing with live testimony and the opportunity to conduct limited discovery pursuant to Fed.R.Civ.P. 65(a). "Normally, an evidentiary hearing is required before an injunction may be granted." *United States v. McGee*, 714 F.2d 607, 613 (6th Cir.1983). But as explained by the Sixth Circuit, a hearing is not needed "unless disputed questions of material fact exist." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville County*, 466 F.3d 391, 398 (6th Cir.2006). The Ninth Circuit is in agreement with this rule. *See Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir.1988). Additionally, a district court's decision to permit or deny further discovery before a permanent injunction is issued is reviewed for an abuse of discretion. *See United States v. Miami University*, 294 F.3d 797, 815 (6th Cir.2002).

In various filings, StreamCast has asked for discovery and an evidentiary hearing before this Court determines whether it is appropriate to issue a permanent injunction in the first place. This request is denied. For example, StreamCast has not demonstrated that there is any dispute regarding the threat of continuing violations or that the public's interest will be harmed by the injunction fashioned by this Court. (StreamCast Request for Evid. Hearing.) StreamCast seeks discovery related to the meaning of the term "robust and secure," which has apparently been used in settlement agreements between Plaintiffs and other peer-to-peer networks to describe the type of filtering mechanism that must be implemented. However, such information is irrelevant to whether an injunction should issue in this case. The same is true regarding claims that Plaintiffs do not always enforce their rights with regard to other peer-to-peer networks. Additionally, the Court observes no merit in StreamCast counsel's rank speculation that Plaintiffs' refusal to disclose their artist-title pairs and hash values are connected to a covert plan to force StreamCast out of business. (Baker Supp. Decl. ¶ 5.) In any event, Plaintiffs' legal position with respect to an ambiguous statute cannot be the basis of an unclean hands defense.

Finally, StreamCast seeks discovery (and perhaps an evidentiary hearing) on the technological effectiveness of various measures that could be utilized to reduce Morpheus's infringing capabilities. The Court considers this request to be moot. The special master will be conferred with the power necessary to fully investigate all available filtering tools, as well as the options for updating legacy software.

### F. Appointment of a Special Master

As filtering and the updating of legacy software are highly technical in nature, and because they are likely to be litigated repeatedly through the injunction's lifespan, the Court intends to appoint a permanent special master to assist in the decree's implementation and supervision. In the near term, the special master will aid this Court's determination of what constitutes the most "effective" filtering regimen, and how StreamCast can implement it.

Shortly, the Court will separately issue a proposed order defining the special master's powers and responsibilities. The par-

ties will be ordered to meet and confer regarding the selection of a special master.

### G. StreamCast's Motion for a Stay Pending Appeal

The Court agrees with Plaintiffs that StreamCast's motion for a stay pending appeal pursuant to Rule 62(c) is premature. *See, e.g., Nikon, Inc. v. Ikon Corp.*, 1992 WL 398440, at *3 (S.D.N.Y. Dec.18, 1992) ("In the absence of a pending appeal, a request for relief under Rule 62(c) is premature."). Once the Court finalizes the terms of a permanent injunction, and an appeal is taken, StreamCast can renew its request. StreamCast's motion is therefore DENIED WITHOUT PREJUDICE.

## IV. CONCLUSION

For the foregoing reasons, this Court GRANTS IN PART Plaintiffs' motion for a permanent injunction. Importantly, StreamCast will be required to use the most effective means available to reduce the infringing capabilities of the Morpheus System and Software, while preserving its noninfringing uses as feasible. StreamCast's motion for a stay of the permanent injunction pending appeal is DENIED WITHOUT PREJUDICE. A special master will be appointed to assist the Court with further proceedings.

IT IS SO ORDERED.